BETZ, Admr., Appellant and Cross–Appellee,

v.

TIMKEN MERCY MEDICAL CENTER et al., Appellees and Cross–Appellants.*

[Cite as *Betz v. Timken Mercy Med. Ctr.* (1994), 96 Ohio App.3d 211.]

Court of Appeals of Ohio,
Stark County.

Nos. 94–CA–0013, 94–CA–0050.

Decided July 25, 1994.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1994), 71 Ohio St.3d 1436, 643 N.E.2d 142.

*The Okey Law Firm, L.P.A., Eugene P. Okey* and *Steven P. Okey,* for appellant and cross-appellee.

*Buckingham, Doolittle & Burroughs* and *Gary A. Banas,* for appellees and cross-appellants.

WILLIAM B. HOFFMAN, Judge.

Plaintiff-appellant and cross-appellee is James R. Betz, Administrator of the Estate of Christine M. Betz ("Betz"). Defendants-appellees and cross-appellants are Alan C. Gatz, M.D., et al. ("Gatz"). Both parties appeal following a jury verdict in the Court of Common Pleas of Stark County in favor of Betz in the total amount of $3,045,688.72. Betz's cause of action was for wrongful death due to medical malpractice. Betz appeals the trial court's order of a remittitur, while Gatz appeals the trial court's denial of his request for a new trial.

On September 23, 1990, at 12:30 p.m., Christine Betz presented herself at the emergency room of Timken Mercy Medical Center complaining of chest pain. She was twenty-three years old at that time. Ms. Betz was assessed by emergency room personnel, including Gatz. After various studies were completed, Gatz again examined Ms. Betz. Ms. Betz was then administered an analgesic and subsequently was discharged at 3:10 p.m. that same day with instructions to return if she did not feel better or to see her family doctor. Dr. Gatz's diagnosis at that time was "chest pain-musculosketal."

In the early morning hours of September 24, 1990, approximately sixteen hours after having been discharged from the hospital, Ms. Betz was found dead in her home by her husband, James Betz. An autopsy revealed that Ms. Betz died from a dissecting ascending aneurysm as a complication of Marfan syndrome.

Ms. Betz had been adopted by her biological grandparents, Josephine and Albert Roudebush, immediately after her birth and raised by them. Ms. Betz married James Betz on July 7, 1990.

Betz assigns as error:

"The trial court abused its discretion in ruling that the jury's unanimous award of damages was excessive and in ordering a remittitur."

Gatz assigns as errors in his cross-appeal the following:

"I. The trial court abused its discretion when it determined that the judgment below was supported by the manifest weight of the evidence and that there was no basis for a new trial when the trial court failed to independently weigh the evidence.

"II. The trial court abused its discretion when it denied the defendant's motion for new trial where the jury awarded excessive damages given under the influence of passion and prejudice."

### Gatz's Cross–Appeal

Though Gatz's notice of cross-appeal was filed after Betz's notice of appeal, we begin our opinion with the cross-appeal because resolution of it could potentially render Betz's appeal moot.

### I

■ Gatz claims herein that a trial court abuses its discretion when it denies a motion for new trial based upon a claim that the verdict is not sustained by the manifest weight of the evidence if the trial court fails to independently weigh the evidence and pass upon the credibility of the witnesses presented at trial. We agree, as did the Ohio Supreme Court in *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph three of the syllabus. Gatz asserts the trial court "clearly" abused its discretion, "since the judgment [verdict] was against the manifest weight of the evidence, and the trial court failed to independently weigh and evaluate the evidence."

■ The record does not demonstrate that the trial court failed to independently weigh the evidence or independently assess the credibility of the witnesses. In fact the record shows the opposite. In its January 10, 1994 judgment

entry, the trial court directly addresses Gatz's claim that the judgment is not sustained by the weight of the evidence. The trial court states:

"The record of the trial speaks for itself. This court has revisited the trial record with reference to the weight of the evidence, the credibility of the witnesses, their testimony and demeanor and readily finds that there is no basis for a new trial on the weight of the evidence."

Gatz fails to point to anything in the record to suggest that the trial court did not do what it said it did. To the contrary, we presume the trial court did exactly what it said it did. This alone would be sufficient reason for us to overrule this assignment of error.

However, we perceive the real thrust of Gatz's argument is that the jury's verdict was against the manifest weight of the evidence. Gatz's argument that the trial court's failure to so find indicates that it failed to independently review the evidence is a non sequitur.

In the syllabus of *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, the Ohio Supreme Court set forth the appropriate standard of review of claims involving manifest weight of the evidence as follows:

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." See, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276.

Upon our review of the evidence, we believe there was competent, credible evidence to support the verdict. The opinions of Drs. Abramson and Pyeritz that Gatz's examination and treatment of Ms. Betz failed to meet the standard of good medical care in that he failed to order an electrocardiogram or consult with a cardiac specialist both support the verdict. It was Betz's contention that such a test should have been ordered as part of the preliminary workup in order to rule out possible cardiac and pulmonary causes for Ms. Betz's chest pain. Whether the electrocardiogram would have been normal or abnormal is not the crucial issue. The failure to order the test was part of Betz's claim that Gatz's exam was superficial, given Ms. Betz's symptoms and complaints, and was evidence that Gatz failed to consider that a cardiovascular catastrophe was occurring. When asked if it was below the standard of good medical care for Gatz not to order an electrocardiogram, even Gatz's own expert witness, Dr. Keihl, opined that such would be "controversial" and that he himself would have ordered one. Additionally, Dr. Hay–Roe, an officer of the defendant corporation, testified that he would find it hard to say whether the standard of care had been met or not.

For both of the foregoing reasons, Gatz's first cross-assignment of error is overruled.

## II

Civ.R. 59(A)(4) provides that a new trial may be granted where excessive (or inadequate) damages appear to have been given under the influence of passion or prejudice.

In support of his claim herein, Gatz points out that Betz was unable to demonstrate any economic loss and failed to present evidence that James Betz was having a difficult time dealing with his wife's death. Gatz notes that James Betz did not suffer any pecuniary loss for grief counselling or suffer any lost wages due to his mental anguish or grief. Gatz then recites a number of comparative cases as authority for the premise that the jury's award was excessive. Finally, Gatz directs us to several instances of alleged improper conduct on the part of Betz's counsel which he claims impassioned or prejudiced the jury.

We have reviewed the record regarding the instances of plaintiff's counsel's alleged misconduct and conclude that none of the instances of conduct, even if assumed, *arguendo,* to have been misconduct, was sufficient to demonstrate that, either standing alone or taken together, it would have evoked an impassioned or prejudiced verdict. Plaintiff's counsel's question regarding an investigation of Gatz by the hospital was never answered, and the jury was instructed to disregard the question. Plaintiff's counsel's attempt to introduce a nurse's manual was unsuccessful, as the manual was excluded from evidence. Plaintiff's counsel's interjection of "huh" during a bench conference concerning the admissibility of the nurse's manual is nondescript and cannot be considered to have improperly influenced the jury. Finally the plaintiff's counsel's analogy to the value of a race horse during closing argument does not go outside the wide latitude afforded counsel during argument. See *Stonerock v. Miller Bros. Paving, Inc.* (1991), 72 Ohio App.3d 123, 137, 594 N.E.2d 94, 103–104, for an analogous result.

Betz counters Gatz's "comparative case" argument by reciting a number of his own comparative cases as authority for the premise that the jury's award was not excessive. We find this battle of comparative cases by both parties unpersuasive. What we must decide is whether "the jury's assessment of damages was so disproportionate as to shock reasonable sensibilities." *Jeanne v. Hawkes Hosp.* (1991), 74 Ohio App.3d 246, 256–258, 598 N.E.2d 1174, 1181. The mere return of a large verdict does not warrant a finding of passion or prejudice.

The trial court directly addressed this issue in its entry and found that though the jury's award was manifestly excessive, it did not appear to be due to passion or prejudice. We agree with the trial court that the jury's award was not influenced by passion or prejudice and therefore conclude the trial court did not abuse its discretion in overruling Gatz's motion for new trial on this basis.

Gatz's second assignment of error is overruled.

### Betz's Appeal

■ Fundamental to our justice system is the right to a jury of our peers. It is in their collective wisdom that the parties place their trust. We must be "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal,* 10 Ohio St.3d at 80, 10 OBR at 410, 461 N.E.2d at 1276. Also, "It is the function of the jury to assess the damages, and generally, it is not for a trial or appellant court to substitute its judgment for that of the trier-of fact." *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 469.

■ Though the trial court is prohibited from substituting its own judgment as to damages for that of the jury, the jury's decision is not inviolate. The legal concept of remittitur was developed to provide the trial court with the procedural mechanism by which it could adjust or correct an unjust award. However, prior to doing so, the damages awarded by the jury must be "so manifestly against the weight of the evidence to show a misconception by the jury of its duties." *Howard v. City Loan & Savings* (Mar. 27, 1989), Greene App. No. 88–CA–39, unreported, at 6–7, 1989 WL 33137. "Remittitur is only proper where a court can affirmatively find that the jury's verdict is manifestly excessive." *Uebelacker v. Cincom Systems, Inc.* (1992), 80 Ohio App.3d 97, 103, 608 N.E.2d 858, 862. See, also, *Scott v. Hall* (Sept. 9, 1988), Montgomery App. No. 10921, unreported, at 5, 1988 WL 93668.

■ While recognizing the above presumption in favor of sustaining the jury's verdict, we must also be cognizant of our standard of review in this case. At issue is whether, given the deference the trial court was required to give to the jury's verdict, the trial court abused its discretion in granting the remittitur. To demonstrate an abuse of discretion, it must be shown that the trial court's decision was unreasonable, arbitrary or unconscionable. *In re Adoption of Ridenour* (1991), 61 Ohio St.3d 319, 320, 574 N.E.2d 1055, 1057.

With these two standards of review as our guide, we begin with a recitation of the jury's breakdown of damages. The jury unanimously awarded compensatory damages as follows:

(a) James R. Betz, for the wrongful death of his wife, Christine M. Betz: $2,500,000;

(b) Josephine Roudebush, for the wrongful death of her daughter, Christine M. Betz: $150,000;

(c) Albert E. Roudebush, for the wrongful death of his daughter, Christine M. Betz: $150,000;

(d) the estate of Christine M. Betz, for the surviving personal injury claim of Christine: $240,000;

(e) reasonable funeral and burial expenses: $5,688.72.

TOTAL DAMAGES: $3,045,688.72.

The trial court determined that the awards given to James R. Betz, individually and as surviving spouse, and the award given to the estate of Ms. Betz were excessive, although they did not appear to be given under the influence of passion or prejudice. Accordingly, the trial court remitted the award to James R. Betz to $1,650,000 and remitted the award to Ms. Betz's estate to $120,000 for her pain and suffering.

In wrongful death claims, R.C. 2125.02 recognizes the following as compensatory damages which may be awarded:

(1) Loss of support from the reasonably expected earning capacity of the decedent;

(2) Loss of services of the decedent;

(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, minor children, parents, or next of kin;

(4) Loss of prospective inheritance to the decedent's heirs at law at the time of his death;

(5) The mental anguish incurred by the surviving spouse, minor children, parents, or next of kin.

In bodily injury claims, compensatory damages include, but are not limited to, medical expenses, lost wages and pain and suffering. While some of the damages noted above are objective in nature in that they are directly related to identifiable monetary loss, *i.e.*, medical expenses, lost wages and funeral expenses, others are subjective in nature in that they are less easily quantifiable, less tangible, or unliquidated, *i.e.*, pain and suffering, loss of society, mental anguish, etc. How much is the loss of companionship of a wife worth? How much should a grieving parent be awarded to compensate for the loss of a son or daughter? How much

should one receive for conscious pain and suffering caused by the wrongful act of another? When is monetary compensation for any of the above losses excessive? With those questions in mind, we begin our analysis of the trial court's decision to grant a remittitur.

The trial court begins its decision by noting that the jury's award herein is "reportedly the largest award in the history of Stark County." The trial court declares that "the functions of the court and jury are distinct and each is supreme in its own domain. It is the exclusive province of the court to determine all questions of law and is the equally exclusive province of the jury to determine all questions of fact." The trial court later remarks that the justice system (the jury) "hopefully" reflects the community's values and pronounces its personal "reverence" for the jury system. The trial court later acknowledges that it does not "possess the divine power to assess with exactitude the compensatory damages" and that it has "consciously endeavored not to second-guess the jury and to substitute its judgment so as to arbitrarily and prejudicially affect the jury award." It is against this backdrop that the trial court begins its analysis of the jury's award.

The trial court first notes that both parties place significance on the fact that Ms. Betz and James were married a relatively short time. The trial court notes that "this has been done to convince the court that the surviving spouse is entitled to a lesser award because of the relatively short duration of the marriage [as opposed to] that he [James] is entitled to his award because of the many years the surviving spouse will be denied the living companionship of Christine. Both views are highly speculative and the court has not been unduly affected by these arguments." We agree with the trial court that the fact that the marriage was of short duration can be presented in two extremely different ways as it relates to the issue of damages. Is the loss of a spouse after many years of companionship and many precious memories shared greater than the loss of the opportunity to spend those many years together and create those precious memories?

Next the trial court notes counsel's (presumably defendant's counsel though the trial court does not clearly indicate such) appraisal of the case as being "dismally low" as demonstrative of the "inability of seasoned professionals to generally, accurately predict jury verdicts." We are left to speculate as to the significance the trial court placed on counsel's monetary evaluation in its decision to grant the remittitur but we suggest that reliance thereon is fraught with danger in that pretrial evaluations take in a number of speculative factors which may be influenced by events which occur during the actual trial, particularly issues concerning negligence, proximate cause and damages.

It is in the final one-third of the trial court's entry that it begins to explain its reasons for reducing the jury's award in this specific case. The trial court

acknowledges its "conjecture" and "sense" that certain events had an obvious effect upon the jury: Ms. Betz's youthful age and her unnecessary death; the empathy generated for James and Ms. Betz's parents concerning their agony and grief; the "exceptional lawyering" by plaintiff's counsel; the lack of aggressive evidence contradicting the $3,500,000 sought by plaintiff; and the demeanor of appellee, who appeared somewhat arrogant, perhaps insensitive or superficially attentive to Ms. Betz's complaints. Though it is difficult for us to share the trial court's "sense" based upon the cold record before us, it seems obvious to us that all of these events would, indeed should, have an effect upon the jury's verdict with the possible exception of the assessment of appellee's arrogance. Though the trial court senses the above factors, it does not reveal what impact they had on its ultimate decision.

The trial court next selects the award given to Ms. Betz's parents (the Roudebushes) as the "single most important factor that caused the court to modify the jury's award." The trial court concluded that the award of $150,000 to each parent is "realistic and conceivably reflective of a community standard." It pronounces that portion of the award to be fair and equitable and the court proclaims it is the "yardstick" in evaluating James's award and the award for pain and suffering. The trial court reasoned that the mental anguish suffered by a mother who has given birth and reared a child for twenty-three years is certainly no less than a husband who loses a wife. Who is to say whose loss is more or less? This pronouncement appears to us to be nothing more than the personal philosophy of the trial court. Why is the award of $150,000 to each parent realistic and supposedly reflective of a community standard? Is $50,000 realistic? Is $250,000 realistic? What relevance does "community standard" play in determining the amount of loss an individual parent suffers by the death of his or her adult child? More important, what reason is there for elevating the parent's award to the status of the standard or "yardstick" by which all other damages are to be compared? Is the loss of a husband-wife relationship, even if of short duration, inherently less valuable than the loss of a parent-child relationship?

Despite its earlier admonition that it found the arguments concerning the shorter duration of the marriage highly speculative and that it would not be unduly affected by the same, the trial court contradicts itself at this stage in the decision by finding such to be "obviously significant." The trial court reasons that the bond between a husband and wife grows stronger and they become more dependent on each other as they spend more time together. The trial court unilaterally determines that the loss occasioned by the abrupt termination of many years of companionship outweighs the loss of the opportunity to spend

those many years together. We are left to ask who is the trial court, indeed who are we, to make this decision? Is not that decision best left for the jury?

The trial court concludes by deciding that the award to the surviving spouse should be "eleven-fold" that which the jury awarded each parent of Ms. Betz. We are again left to wonder why eleven-fold? Why not ten-fold or five-fold? Why not twenty-fold? When asked this very question during oral argument, appellee's counsel candidly conceded he did not know why the trial court chose eleven as the appropriate multiplier. We believe the trial court's choice was clearly arbitrary.

As to Ms. Betz's pain and suffering, the trial court concluded that the award of $240,000 for the sixteen to eighteen hours of what was described as Ms. Betz's "severe, stabbing chest pain" was excessive. As Ms. Betz's aortic wall weakened, the pumping action of her heart tended to dissect, or split, the aortic tissue. This allowed the heart to pump blood into the pericardial sac which surrounds the heart. This blood-filled sac then squeezed Ms. Betz's heart until it could no longer pump, resulting in her death. The trial court came to its decision that the award was excessive by dividing the award given by the jury by the number of hours of pain and suffering Ms. Betz endured and then multiplying that rate by the appropriate number of hours in, first, a week, and, second, a month. Based on those rates, the trial court notes that other litigants have never been compensated so generously.[1]

The propriety of multiplying the jury's "hourly rate" award for Ms. Betz's pain and suffering by days, then weeks, to assess whether the jury's award was excessive is, at its best, questionable. Pain and suffering are personal and subjective by nature. Each individual case presents unique facts for the jury's determination. Comparison with other cases will inevitably result in facially inconsistent results. Neither approach should be relied upon when assessing the appropriateness of a jury's verdict.

We are left with the opinion that the trial court did exactly what it initially recognized it cannot do, i.e., invade the province of the jury. Despite its declared reverence for the jury system, we believe the trial court's decision is replete with its personal philosophical conclusions, senses, perceptions and conjectures. We believe the trial court's opinion demonstrates nothing more than the judge's subjective disagreement with the size of the verdict. We conclude the trial court

---

1. This comes after the trial court has already indicated it would not rely upon other cases for precedent because the facts and circumstances in this case are uniquely different from the many cases cited by the parties.

abused its discretion in concluding that the jury's verdict was manifestly excessive, thereby resulting in its grant of a remittitur.

Accordingly, we sustain appellant and cross-appellee's sole assignment of error.

*Judgment affirmed in part
and reversed in part.*

GWIN, P.J., and SMART, J., concur.