OPINION
{¶ 1} Plaintiff-appellant Mark Hiner appeals from the January 18, 2005, Judgment Entry of the Stark County Court of Common Pleas denying his Motion for a New Trial.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On January 26, 2001, appellant Mark Hiner's grandmother, Ann Hiner, was killed in an automobile accident. At the time of the accident, appellant had an automobile liability insurance policy with appellee Nationwide Mutual Insurance Company which contained underinsured motorist coverage in the amount of $12,500.00 per person.
 {¶ 3} On January 23, 2004, appellant filed a complaint against appellee, alleging that he was entitled to "the $12,500.00 underinsured motorist coverage for the wrongful death of Ann E. Hiner." Appellant specifically sought damages under R.C. 2125.02, the wrongful death statute. A jury trial commenced on October 13, 2004, to determine appellant's damages.
 {¶ 4} At trial, appellant's mother, Jane Hiner, testified that Ann Hiner [hereinafter "the decedent"] was her mother-in-law and that after her husband, the decedent's son, was injured in an accident twenty four years earlier and was permanently and totally disabled, the decedent "stepped up to be like she was like a second mother to my children, and she was there when I couldn't be because of all the rehab and stuff that my husband experienced." Transcript at 159. At the time of his father's accident, appellant was twelve years old. According to Jane Hiner, after the accident, the decedent would cook for her grandchildren and counsel them and would take them to school events and church. Jane Hiner further testified that her mother-in-law planned her grandchildrens' weddings and gave them money to purchase their first homes and was very close to her great grandchildren.
 {¶ 5} During direct examination, Jane Hiner further testified that the decedent was the matriarch of the family and that the family frequently got together for birthdays and holidays. When asked about the decedent's relationship with appellant, Jane Hiner testified that appellant, who was the first born grandchild, was the decedent's favorite grandchild and that the decedent spoiled him and would always give him money. At trial, Jane Hiner was also questioned about her mother-in-law's health. Jane Hiner testified that the decedent had a mastectomy three years prior to the accident that killed her and that "the cancer had returned with a vengeance and she was undergoing chemotherapy." Transcript at 165. According to Jane Hiner, the cancer had spread to the decedent's lungs and brain, and at the time of her death, the decedent was still undergoing chemotherapy. The following testimony was adduced when Jane Hiner was asked whether the decedent was still there for her grandchildren at the time of her illness:
 {¶ 6} "A. Oh yes, all the time. She would, uh, have me bring them over — well, they live on a lake so that was an incentive, you know, especially in the warm weather, they had the beach and stuff. She always went on picnics, and she like, she liked, uh — Christmastime was her favorite. You know, she would decorate a bulb for each grandchild or child and — she was definitely the hub of the family." Transcript at 166-167. Hiner further testified that appellant took the decedent to chemotherapy four times a week and was the decedent's handyman.
 {¶ 7} At trial, Jane Hiner testified that the decedent had left for Florida on November 15, 2000, to stay with her daughter for a few months and that, in January of 2001, she and her husband flew down to Florida to pick the decedent up and bring her home. The decedent was killed instantly due to an accident on the way home from the airport. The following testimony was adduced when Jane Hiner was asked what impact the decedent's death had on appellant:
 {¶ 8} "A. Well, most certainly, um, it was, it was a dual tragedy for everybody, you know, to lose somebody that fought so gallantly to live, um, and then almost lose his parents,[1]
too. He was a little bit out of control for a while even though he tried to be brave and, and help and, and show — cause I was hurt pretty bad and he had to take over a lot at the farm and, um — we could not let him go to the trial of fellow that — of the fellow that hit us because we were afraid he would physically — there would be a physical altercation and, um —." Transcript at 176-177.
 {¶ 9} On cross-examination, Jane Hiner testified that the decedent was treated for cancer while she was in Florida and that the doctors in Florida had told the decedent that she could not receive radiation again. According to Jane Hiner, the decedent would typically spend the entire winter in Florida and would return to Ohio in March or April, so it was unusual for her to return to Ohio in January.
 {¶ 10} Appellant also testified at trial. Appellant testified that he lived approximately two and a half miles away from the decedent's house and that the decedent, his grandmother, was like a mother to him and was always there, physically and mentally, for him if he had a problem or needed money. Appellant testified that he was "very, very close" to his grandmother. While appellant would borrow money from his grandmother, he was not dependent on her for financial support and tried to pay the money back. When asked, appellant testified that he was not making a claim for financial support. Appellant further testified that he went to his grandmother approximately seventy percent of the time for advice and guidance since his mother was always busy and that his grandmother gave him "good, solid advice." Transcript at 187. The following testimony was adduced when appellant was asked whether he was still going to his grandmother for advice even though she had cancer:
 {¶ 11} "A. Oh yeah. Yeah, she, she was coming to the end of her life, and it's part of what I missed is when she was coming home, uh, she was coming home — I, I didn't get my family history on her side and a lot of things that, that I didn't — I didn't even get to tell her good-bye or anything. Or hello when she was coming back, you know.
 {¶ 12} "Q. You knew eventually that she was going to die from the cancer?
 {¶ 13} "A. Yeah. To, to me that made the possible years she had left of life worth much more than anybody could ever put on it, you know. It's uh — I don't know." Transcript at 187-188.
 {¶ 14} Appellant further testified that his grandmother, who was teaching him to paint, was a major part of his life and that she was his friend. After hearing of his grandmother's death, appellant "almost flipped out" and "felt lost right away." Transcript at 190, 191. Appellant further testified that his grandmother's death left a big hole in his heart and that he was still not over her death.
 {¶ 15} On cross-examination, appellant testified that he was married and that the decedent was not living with him at the time of her death. Appellant also testified that the decedent went down to Florida because she knew that she was close to dying and wanted to see her family down in Florida and to get her affairs in order. Appellant further testified that his parents occasionally loaned money to him and that he was not making a claim for loss of services due to his grandmother's death. When asked, appellant testified that he did not receive an inheritance from his grandmother.
 {¶ 16} At the conclusion of the evidence and the end of deliberations, the jury, on October 13, 2004, returned with a verdict in favor of appellee. The jury's verdict was memorialized in a Judgment Entry filed on October 20, 2004.
 {¶ 17} Thereafter, on October 27, 2004, appellant filed a Motion for Judgment Notwithstanding the Verdict and/or Motion for a New Trial, arguing that he was entitled to judgment as a matter of law and that the jury verdict was against the manifest weight of the evidence. Pursuant to a Judgment Entry filed on January 18, 2005, the trial court overruled appellant's motions, stating, in relevant part, as follows:
 {¶ 18} "The evidence showed that the Plaintiff knew that his grandmother, Ann Hiner was terminally ill with cancer, and that she was returning from temporary residence in the State of Florida, to her daughter's residence in Carroll County, Ohio, to prepare for her death.
 {¶ 19} "Under these circumstances, the jury did not find that the Plaintiff had proved proximate cause of damages to himself, which was a determination they were permitted to make under the instructions given by the court and the verdicts and interrogatories submitted to them."
 {¶ 20} Appellant now raises the following assignments of error on appeal:
 {¶ 21} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN OVERRULING A MOTION [SIC] TO A NEW TRIAL BECAUSE THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 22} "II. THE TRIAL COURT ABUSED ITS DISCRETION BY OMITTING EVIDENCE IN A WRONGFUL DEATH CASE THAT THE DECEDENT WAS KILLED BY A DRUNK DRIVER.
 {¶ 23} "III. THE JURY INSTRUCTION THAT DID NOT INCLUDE AN INSTRUCTION AS TO PROXIMATE CAUSE WAS PLAIN ERROR WHERE THE TRIAL COURT'S CURATIVE INSTRUCTION WAS CONFUSING."
 I {¶ 24} Appellant, in his first assignment of error, argues that the trial court erred in overruling his motion for a new trial because the jury's verdict was against the manifest weight of the evidence. We disagree.
 {¶ 25} Appellant specifically alleged that he was entitled to a new trial pursuant to Civ.R. 59(A)(6) and (A)(7). Civ. R. Rule 59 states, in relevant part, as follows:
 {¶ 26} "(A) Grounds
 {¶ 27} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds: . . .
 {¶ 28} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
 {¶ 29} (7) The judgment is contrary to law . . ."
 {¶ 30} The granting of a new trial rests in the sound discretion of the trial court. Civ.R. 59. See also Brooks v.Wilson (1994), 98 Ohio App.3d 301, 648 N.E.2d 552. We cannot substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, the trial court abused its discretion. Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 541 N.E.2d 597. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
 {¶ 31} When considering a Civ.R. 59(A)(6) motion, the trial court must weigh the evidence and pass on the credibility of the witnesses. The trial court's consideration of weight and credibility is not the same as that employed by the jury, but in a more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the weight of the evidence. Rohde v. Farmer (1970),23 Ohio St.2d 82, 262 N.E.2d 685, paragraph three of the syllabus. A trial judge should "`abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.'" Bland v. Graves (1993), 85 Ohio App.3d 644,651, 620 N.E.2d 920.
 {¶ 32} Further, "[i]t is the function of the jury to assess the damages, and generally, it is not for a trial or appellate court to substitute its judgment for that of the trier-of fact."Betz v. Timken Mercy Med. Ctr. (1994), 96 Ohio App.3d 211, 218,644 N.E.2d 1058.
 {¶ 33} Appellant, in his first assignment of error, initially argues that the jury verdict is contrary to law and that, therefore, he is entitled to a new trial in accordance with Civ.R. 59(A)(7). Appellant specifically contends that the verdict is contrary to law since defense counsel admitted during closing argument that appellant suffered damages as a result of the death of his grandmother.
 {¶ 34} During closing argument, defense counsel stated, in relevant part, as follows:
 {¶ 35} "If you believe that there is some mental anguish suffered by Mark Hiner as a result of the loss of his grandmother, I think the evidence — I would suggest to you that the evidence supports only sort of the typical emotion, and I don't mean to denigrate it but, the typical emotion, the, the typical sort of grieving that you would feel for the loss of a grandparent, um, and supports nothing in addition to that.
 {¶ 36} "Uh, and if you consider that, I think fair compensation — and this is why — and this is difficult because we don't have any numbers to work with. We don't have any support numbers. We don't have any loss of services number. We don't have any prospective inheritance numbers. We don't have any numbers. But I would suggest to you that based upon the evidence that a fair evaluation of this loss of typical grieving for the loss of a grandparent would be $1,000. And I would ask if you feel thathe's met his burden and demonstrated that he has sustained thatloss that that would be a fair evaluation of that injury."
Transcript at 219-220. (Emphasis added). Furthermore, during opening statements, defense counsel indicated to the jury that "the evidence ultimately will show that this is a normal grief following the loss of a grandparent, um, and nothing beyond that." Transcript at 152.
 {¶ 37} Based on the foregoing, we find that defense counsel did not stipulate that appellant had suffered damages as a result of the decedent's death. Rather, from our review of the record, it is clear that appellee stipulated that the only issue to be presented to the jury was the amount of damages.
 {¶ 38} As is stated above, appellant was seeking damages pursuant to R.C. 2125.02, the wrongful death statute. Such statute states, in relevant part, as follows:
 {¶ 39} "(B) Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:
 {¶ 40} "(1) Loss of support from the reasonably expected earning capacity of the decedent;
 {¶ 41} "(2) Loss of services of the decedent;
 {¶ 42} "(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;
 {¶ 43} "(4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death;
 {¶ 44} "(5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent."
 {¶ 45} Furthermore, R.C. 2125.02(A)(3) also states, in relevant part, as follows:
 {¶ 46} "(b)(i) In determining the amount of damages to be awarded, the jury or court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."
 {¶ 47} In the case sub judice, appellant did not seek damages for loss of support or loss of services or for loss of prospective inheritance. Rather, appellant sought damages for loss of society and mental anguish pursuant to R.C. 2125.02(B)(3) and (5). As is stated above, appellant, an adult married male, testified at trial that the decedent, his grandmother, had been like a second mother to him since he was approximately thirteen years old, that her death caused him mental anguish and that he suffered from the loss of her companionship, guidance, advice and caring.
 {¶ 48} However, to mitigate damages in a wrongful death action, the defendant may offer evidence into the record which tends to prove that the decedent would only have lived a short period of time had his or her death not been accelerated by the tortious act. Larrissey v. Norwalk Truck Lines, Inc. (1951),155 Ohio St. 207, 98 N.E.2d 419, paragraph two of the syllabus;Taylor v. C. Lawrence Decker, M.D., Inc. (1986),33 Ohio App. 3d 118, 514 N.E.2d 754. See also Freeman v. Univ. of Cincinnati
(April 5, 1990), Franklin App. No. 89AP-876, 1990 WL 40039.
 {¶ 49} In the case sub judice, testimony was adduced at trial that appellant's grandmother, at the time of her death, was terminally ill with cancer that had spread to her brain and lungs. Appellant himself testified that his grandmother returned to Ohio early from Florida since "she knew she was close to getting her affairs in order — in order because she was close to passing." Transcript at 193-194. Furthermore, while appellant claimed that he suffered mental anguish, there was no evidence that he received any type of counseling from a counselor, minister, psychologist or psychiatrist as a result of his grandmother's death.
 {¶ 50} Based on the foregoing, we find that the trial court did not abuse its discretion in overruling appellant's motion for a new trial. We cannot say that the trial court's decision was arbritrary, unconscionable or unreasonable based on the evidence adduced at trial.
 {¶ 51} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 52} Appellant, in his second assignment of error, argues that the trial court abused its discretion in omitting evidence that the decedent, his grandmother, was killed by a drunk driver. We disagree.
 {¶ 53} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Therefore, we will not disturb a trial court's evidentiary ruling unless we find the trial court abused its discretion. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." See Blakemore, supra.
 {¶ 54} As a general rule, all relevant evidence is admissible. Evid.R. 402. However, Evid.R. 403(A) reads: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." As an appellate court, we will not interfere with a trial court's balancing of probativeness and prejudice "* * * unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby." State v. Slagle (1992),65 Ohio St.3d 597, 602, 605 N.E.2d 916.
 {¶ 55} At trial, appellant sought to introduce evidence that his grandmother, the decedent, had been killed by a drunk driver, arguing that "[m]ental anguish is impacted by the way in which Ann Hiner was killed and being killed by a drunk driver as to the mental anguish of the next of kin . . ." Transcript at 7. The trial court, however, refused to allow in such evidence, finding that the probative value was outweighed by the danger of unfair prejudice to appellee.
 {¶ 56} We find that the trial court did not abuse its discretion in omitting such evidence since the trial court's decision was not arbitrary, unconscionable or unreasonable. As noted by appellee, since liability for the accident was not at issue in this case, only damages,[2] whether or not appellant's grandmother was killed by a drunk driver is irrelevant. Furthermore, assuming, arguendo, that such evidence is probative, we find that the trial court did not abuse its discretion in finding that any probative value would be outweighed by the danger of unfair prejudice to appellee. If the jury knew that appellant's grandmother had been killed by a drunk driver, the jury might be more inclined to award damages to appellant out of moral outrage. Finally, we concur with appellee that any probative value was outweighed by the danger of confusion of issues and misleading of the jury. As noted by appellee in its brief, "[h]ow was the jury to draw this fine, complex legal distinction between offering evidence that the tortfeasor may have been under-the-influence of alcohol only applied to the `mental anguish' of the appellant and was not to be considered when awarding damages?".
 {¶ 57} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 58} Appellant, in his third assignment of error, argues that the trial court's jury instructions were confusing and constituted plain error. We disagree.
 {¶ 59} Implementation of the plain error doctrine is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Reichert v.Ingersoll (1985), 18 Ohio St.3d 220, 223, 480 N.E.2d 802. The plain error doctrine permits correction of judicial proceedings where error is clearly apparent on the face of the record and is prejudicial to the appellant. Id. Although the plain error doctrine is a principle applied almost exclusively in criminal cases, the Ohio Supreme Court has stated that the doctrine may also be applied in civil cases, if the error complained of would have a material adverse affect on the character and public confidence in judicial proceedings. Id. at 223, citing Schade v.Carnegie Body Co. (1982), 70 Ohio St.2d 207, 209,436 N.E.2d 1001.
 {¶ 60} In the case sub judice, after the trial court instructed the jury, appellant's counsel indicated to the trial court, and defense counsel agreed, that there was no definition of proximate cause in the jury instructions. The trial court then read the jury an instruction defining preponderance of the evidence. After being advised by counsel that it had failed once again to give a proximate cause instruction, the trial court instructed the jury as follows:
 {¶ 61} "THE COURT: Again, I read to you proximate cause. As with the prior reading, this is not to be given any more importance than any other instruction that I've given.
 {¶ 62} "A party who seeks to recover for injury or damage must prove not only that the other party was negligent but also that such negligence was a proximate or direct cause of injury or damages.
 {¶ 63} "Proximate cause is an act or failure to act which in the natural and continuous sequence directly produces, uh, injury, physical harm, damages, and without which it would not have occurred. Cause occurs when harm, physical harm, injury, damages is the natural and foreseeable result of the act or failure to act.
 {¶ 64} "There may be more than one proximate cause. When the negligent act or failure to act of one party continues and combines with and joins — and/or joins the negligence of another to produce the injury, damage — or damage, the negligence of each or both is a cause. It is not necessary that the negligence of each occur at the same time, place nor that there be a common purpose or action." Transcript at 248-249. When asked, appellant's counsel indicated to the trial court that the proximate cause instruction that was given was sufficient.
 {¶ 65} We find that, once advised of its omission, the trial court correctly defined proximate cause for the jury. We cannot say that, as a whole, the jury instructions were confusing or that there has been a miscarriage of justice.
 {¶ 66} Appellant's third assignment of error is, therefore, overruled.
 {¶ 67} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J. Boggins, P.J. and Hoffman, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Jane Hiner and her husband also were injured in the accident.
[2] Specifically, the issue at trial was whether appellant was entitled to $12,500.00 underinsured motorist coverage under his insurance policy.