DECISION. *Page 2 
{¶ 1} In this medical-malpractice case, defendant-appellant Carl Gilbert challenges the jury verdict and the award of prejudgment interest in favor of plaintiff-appellee Celeste Wynn. Wynn alleged that Dr. Gilbert had severed the wrong duct while removing her gallbladder, and that the reconstructive repair had been done in reverse peristaltic order, causing her excruciating post-operative pain.
 {¶ 2} Dr. Gilbert's defense was denial, even in the face of overwhelming evidence that he had botched the operation. The jury saw through the masquerade. And this ostrich-like defense more than supported the trial court's award of prejudgment interest. We affirm the trial court's judgment in all respects.
 I. The Mistake — and Consequences {¶ 3} The removal surgery was initially planned as a micro-invasive laparoscopic procedure. But after cutting the wrong duct, Gilbert was forced to modify the operation to an open procedure so that he could repair his error and better identify Wynn's anatomy. Gilbert opened Wynn up, consulted fellow surgeons on how to proceed, removed the gallbladder, and then attempted a Roux-en-Y to reconstruct the errantly transected duct.
 {¶ 4} After surgery and for the next six months, Wynn experienced excruciating pain, lost 46 pounds, and had little strength to care for either herself or her children. Gilbert was unable to determine the cause of Wynn's extreme pain, eventually hypothesizing that she was suffering from phantom pains or depression.
 {¶ 5} Wynn sought another opinion from Dr. Jeffrey Matthews, Chairman of the Department of Surgery at the University of Cincinnati. During an exploratory *Page 3 
surgery, Matthews discovered that the Roux-en-Y procedure had been done in reverse peristaltic order (counter to the main alimentary-tract progression). With the faulty reconstruction, food "traveled against the grain," towards the common bile duct and liver. Matthews reconnected Wynn's intestines from the reverse order to the proper orientation, and she recovered and sued.
 II. Wynn's Background and Surgeries {¶ 6} Wynn had the gallbladder-removal surgery in October 2001, and at the time she was in otherwise good health. She was a married 36-year-old hair stylist and mother of an 18-month-old son and a 9-year-old daughter.
 {¶ 7} This case can be divided into three significant events: (1) the laparoscopic cholecystectomy ("gallbladder surgery"), (2) the resulting Roux-en-Y choledochojejunostomy (the "reconstructive repair"), and (3) Matthews's exploratory surgery ("exploratory surgery"). The negligent gallbladder surgery and resultant reconstructive repair were two separate procedures that occurred during the same surgery in October 2001. The exploratory surgery was completed in April 2002.
 III. The Gallbladder Surgery {¶ 8} A laparoscopic gallbladder surgery initially requires the surgeon to correctly identify the Triangle of Calot. The Triangle refers collectively to the cystic duct, the common bile duct, and the liver. Only after the Triangle has been visualized should the first cut be made; and only the cystic duct should be transected. Identification of all three sides of the Triangle is critical because in isolation the cystic duct and the common bile duct are nearly indistinguishable. But if the surgeon is able to see the liver and both the common bile duct and the cystic duct *Page 4 
simultaneously, then the two ducts can be differentiated. Again, it is the cystic duct that should be transected and not the common bile duct.
 {¶ 9} While attempting the minimally invasive laparoscopic procedure, Gilbert completely severed the common bile duct, necessitating a more invasive open procedure. At trial, Wynn argued that Gilbert had failed to identify the Triangle and that this conduct fell below the surgical standard of care. Gilbert countered that he had reasonably identified the cystic duct, but that in hindsight he had simply misidentified Gilbert's anatomy. That the wrong duct was transected is certain.
 IV. The Reconstructive Repair and its Aftermath {¶ 10} After cutting the wrong duct, Gilbert was forced to convert the surgery to an open procedure so that he could better identify Wynn's anatomy and perform the reconstructive repair of the wrongly severed common bile duct. Because the duct had been completely severed, Gilbert was required to perform a duct-to-duct surgical connection (anastomosis) between her lower intestine and her common bile duct. In this procedure, a transection is made at a random point of the lower intestine (jejunum). The lower (distal) end of the transection is connected (anastomosed) to the injured common bile duct, creating a defunctionalized limb. The upper (proximal) end of the transection is then remerged (anastomosed) downstream (to the defunctionalized limb), creating a Y. When the procedure is performed correctly, food and bile are propelled in one direction.
 {¶ 11} A week after the surgery, Wynn was unable to walk without assistance, was very weak, and could not ingest enough food to maintain proper nutrition. These ailments were compounded with periods of 104° — 106° fever, dry skin, and pain. She *Page 5 
also suffered from inflamed bile ducts and had a biliary anastomotic leak (biliary fluid leaking into her abdominal cavity at the point of the surgical connection).
 {¶ 12} Wynn required 24-hour aid including assistance in dressing, bathing, rearing her children, and using the restroom. She could not work, and every time she attempted to eat, she would experience excruciating pain that "felt like food was cutting through her system." Wynn's sister described the aftermath of ingestion as agonizing to watch and hear: "[W]ithin minutes of ingesting anything * * * [an] awful gurgling sound [could be heard], and [Wynn] would start to rock and shake. It was agonizing to watch her attempt to eat, but we felt like we ha[d] to work with her to get her to eat just to stay alive." Wynn's mother similarly testified that, after Wynn would swallow, her stomach could be heard churning from across the room and that it sounded as if something in her intestine was twisted and moving in the wrong direction.
 {¶ 13} These symptoms progressively eroded Wynn's health. She lost 27 pounds in two weeks, and 46 pounds total. For the pain, Wynn was prescribed Demerol, Dilaudid, Morphine, Percocet, Roxicet, and Vicodin over the next six months. At one point, Wynn's symptoms had become so insufferable that she posited that if the pain did not kill her, then she would likely die of starvation.
 {¶ 14} Again Gilbert attributed Wynn's symptoms to phantom pain and depression. Gilbert acknowledged that he did not "really know what was causing the damn problem." Wynn, having had enough, sought a new physician.
 V. The Exploratory Surgery {¶ 15} Wynn made an appointment with Dr. Matthews, who eventually suggested an exploratory surgery to determine the cause of Wynn's symptoms. *Page 6 
There were no intervening surgeries between Gilbert's gallbladder surgery and reconstructive repair, and Mathews's exploratory surgery.
 {¶ 16} About six months after Gilbert's removal and repair surgery, Matthews opened Wynn up and made a "striking discovery." He found that the reconstructive repair had been done in reverse order. The upper (proximal) end of the transected jejunum was connected to the common bile duct rather than the lower (distal) end.
 {¶ 17} The resulting anatomy directed food against the normal peristaltic flow toward, rather than away from, the bile duct and the liver.
 {¶ 18} Matthews had to completely revise Gilbert's reconstruction from the reverse manner to the proper orientation. About six months after Matthews's corrective surgery, Wynn testified, she was feeling much better: "I felt like I was * * * alive [again]." It took Wynn an entire year after Matthews's exploratory surgery to fully recover.
 VI. The Trial {¶ 19} Throughout the trial, Gilbert denied performing the Roux-en-Y in reverse order. Even after Dr. Matthews documented the reversed Roux-en-Y, Gilbert maintained that he had done the repair surgery correctly — this improbable assertion came despite the fact that no additional surgeries had been performed on Wynn between Gilbert's gallbladder removal and Matthews's exploratory surgery.
 {¶ 20} At trial, Gilbert attributed Wynn's post-surgery complications to a stricture rather than the reversed reconstruction. Then Gilbert attempted to persuade the jury that the reversed reconstruction was medically acceptable, and that even if he had reversed the Roux-en-Y, the resulting connection would have *Page 7 
functioned normally. Then Gilbert attempted to debunk Wynn's assertion that she had been in pain by citing medical records where she had stated that she was in only minimal pain — even though at the time Wynn was under the influence of copious amounts of various pain medication.
 {¶ 21} Conversely, Wynn's evidence showed that Gilbert had errantly severed her bile duct because he had not adequately visualized the Triangle of Calot, and that he had mistakenly reconstructed Wynn's anatomy in reverse peristaltic orientation. Even when confronted with this evidence, Gilbert again denied reversing Wynn's intestines. When asked if he was still "unwilling to admit that [he had] done [the procedure] the way Dr. Matthews * * * found it[,]" Gilbert replied that was "[c]orrect."
 {¶ 22} At trial, the jury heard from Wynn's expert witnesses, Dr. Matthews and Dr. William Schirmer, and four lay witnesses.
 {¶ 23} Gilbert testified on his own behalf along with his expert witness, Dr. Donald Hura. Dr. Farooq Mirza, who had been present for the Roux-en-Y procedure, also testified on Gilbert's behalf. The issue of liability depended on the differing expert opinions of Matthews and Hura.
 {¶ 24} Matthews testified that, while performing the exploratory surgery, he had found that the anastomosis (the surgical connection between the intestine and the bile duct) had been strictured and that the Roux-en-Y had been done in reverse orientation so that peristalsis was propelling food towards the liver and the bile duct.
 {¶ 25} Hura, relying on Gilbert's pre-and post-operative notes, countered that (1) a stricture was the cause of the symptoms, (2) a stricture was a common and a known complication of the Roux-en-Y procedure, (3) strictures often developed *Page 8 
even where a surgeon had met the applicable standard of care (had done nothing wrong), and (4) the Roux-en-Y that had been reflected in Gilbert's pre-and post-operation notes was proper.
 {¶ 26} Gilbert testified that he had not done the Roux-en-Y in reverse order, relying on his pre-and post-operative reports, which noted that the Roux-en-Y had been done in the correct peristaltic order. Gilbert's colleague Mirza observed the surgery and corroborated Gilbert's testimony.
 {¶ 27} A well-educated jury unanimously believed Matthews's testimony. The jury returned a $1,500,000 verdict in Wynn's favor. And because the trial court found that Gilbert had failed to make a good-faith effort to settle and had failed to rationally evaluate his risk, it awarded Wynn $400,469.79 in prejudgment interest. Gilbert's appeal now asserts six assignments and sub-assignments of error in his attempt to overturn the jury verdict and the prejudgment-interest award.
 {¶ 28} Gilbert's assignments of error charge the trial court with error in (1) allowing inflammatory and improper closing arguments; (2) refusing to grant his remittitur or new-trial motions based on the jury's damage award; (3) awarding prejudgment interest; (4) allowing testimony from Wynn's expert that he had previously reviewed cases for Gilbert's expert, thus opening the door for Wynn to question Gilbert's expert on past lawsuits; (5) allowing the use of commonality of insurance between Gilbert and his expert; and (6) failing to instruct the jury on quotient verdicts. We address Gilbert's assignments of error in order. *Page 9 
 VII. Improper and Inflammatory Closing Statements {¶ 29} Gilbert's first argument is that the trial court erroneously allowed Wynn's counsel to make improper and inflammatory statements to the jury during closing arguments, and that those statements entitle him to a new trial.
 {¶ 30} In Ohio, counsel is afforded wide latitude in closing argument, and whether the boundaries of permissible closing argument have been breached is determined in the first instance by the trial court.[1]
Because that determination is one of judicial discretion, it will not be reversed on appeal absent an abuse of that discretion.[2] An abuse of discretion connotes an attitude that is unreasonable, arbitrary, or unconscionable.[3]
 {¶ 31} Gilbert challenges the following comments made during closing argument: "I will tell you what [Gilbert] has done in this case [that] I believe to be imperfect, reprehensible. * * * What's so reprehensible about [Gilbert's] defense is that it is filled with red herrings. * * * [He] ha[s] put this lady through a second bout of hell, through this trial by [his] refusal to be honest, [and his] refusal to admit that she was connected wrongly, [and has asserted] a series of half truths in front of a jury to get away with it."
 {¶ 32} Gilbert's brief also maintains that Wynn improperly reminded the jury that should it wish to send a substantial message, a presumably wealthy insurance company would foot the bill: "How can Dr. Hura be accepted for anything he says when he runs contrary to everybody else in this case. * * * Why bring him *Page 10 
into it? We know he has the same insurance company as [Gilbert]. All the surgeons in the whole world, and he gets picked."
 {¶ 33} At trial, Gilbert failed to object to Wynn's closing argument. A proper and timely objection must be made to support the reversal of a judgment on grounds of misconduct of counsel and improper closing argument to the jury, and in failing to object, a party waives all but plain error.[4] The application of the doctrine of plain error is disfavored in civil appeals, and it should apply "only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."[5]
 {¶ 34} An atmosphere tainted with passion and prejudice is grounds for reversal: "A party that loses a jury trial is entitled to a new trial if opposing counsel has transcended the bounds of acceptable closing argument by creating an atmosphere surcharged with passion or prejudice."[6] The dispositive question is "whether the verdict was rendered on the evidence, or was influenced by improper remarks of counsel."[7] Likewise, "[r]emarks or arguments that are not supported by the evidence and are designed to arouse passion or prejudice to the extent that there is a substantial likelihood that the jury may be misled are improper."[8] Disparaging *Page 11 
remarks not based on the evidence are improper.[9] But a trial court's duty to sua sponte intervene does not apply where counsel's arguments are based on the evidence.[10]
 {¶ 35} We hold that Wynn presented overwhelming evidence from which the jury could have concluded that her symptoms had been caused by Gilbert's negligence. The jury verdict was based on the evidence adduced at trial and was not influenced by allegedly improper remarks. And though we neither condone nor recommend the use of the word "reprehensible" in reference to any party or counsel, we cannot say that in this instance it amounted to obvious and prejudicial plain error sufficient to warrant sua sponte intervention by the trial court.
 VIII. The Remittitur and New-Trial Motions {¶ 36} Gilbert also argues that the trial court erred in failing to grant a new trial or to remit damages. A trial court's denial of remittitur and new-trial motions is ordinarily reviewed under an abuse-of-discretion standard.[11] The assessment of damages is a jury function, and on appeal we will not substitute our judgment for that of the jury.[12] To reverse a jury's damage award, it must appear to be so disproportionate to the harm that it shocks reasonable sensibilities.[13]
 {¶ 37} Wynn's damages in this case included six months of pain and suffering, $113,500 in medical bills, and a large abdominal scar. About a year after Matthews's exploratory surgery, Wynn fully recovered. The essence of Gilbert's argument is that the *Page 12 
jury verdict overcompensated Wynn for her pain and suffering. The amount awarded for pain and suffering is a determination most appropriately delegated to the experience and good sense of jurors.[14] Pain and suffering are personal and subjective in nature, and "each case presents unique facts for the jury's determination."[15]
 {¶ 38} In this case, the evidence showed that for six months Wynn endured excruciating pain. The jury also considered the statements of Wynn's family, who testified to the following: (1) the pain was so intense that Wynn wanted to give up and die; (2) Wynn had to be forced to eat just to keep her alive; (3) when Wynn ingested food, one could hear her stomach churning and gurgling from across the room, and it sounded like the food was cutting through her system, as if "something in her inside, her intestine, was twisting and it wasn't going in the right direction"; (4) Wynn looked like she was dying; (5) Wynn was helpless and could not independently use the bathroom, dress, bathe, or care for her children; and (6) Wynn looked like a zombie and did not have presence of mind.
 {¶ 39} Wynn also testified that, despite her children, the pain was so severe that she did not know whether she wanted to continue living. And her testimony was buttressed by medical records, physician's reports, and the multitude of prescription pain medication she required. And finally, it took Wynn a full year after Mathews's remedial surgery to recover.
 {¶ 40} We hold that the evidence adduced at trial supported the jury verdict, and that verdict was neither excessive nor against the weight of the evidence.[16] And for the same reasons, the verdict was the product of neither passion nor prejudice. *Page 13 
Accordingly, the trial court did not err in denying Gilbert's remittitur and new-trial motions. To the contrary — we believe the jury's verdict was more than reasonable — the evidence could have, in our view, supported an even higher verdict.
 IX. Prejudgment Interest — How Did Gilbert Think He Would Prevail? {¶ 41} Gilbert next argues that the trial court erroneously awarded prejudgment interest, and that the prejudgment-interest statute is unconstitutional.
 {¶ 42} We note that the prejudgment-interest statute is not unconstitutional.[17]
 {¶ 43} The trial court awarded Wynn prejudgment interest running from the date of the gallbladder removal, October 19, 2001, to the date the case was initially set for trial, July 26, 2004, in the amount of $400,469.70.
 {¶ 44} The prejudgment-interest statute was enacted "to encourage settlement efforts * * * and to promote good-faith efforts to settle controversies outside a trial setting."[18] Prejudgment interest is authorized where "the party required to pay the money failed to make a good faith effort to settle the case and [where] the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."[19] "A party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a *Page 14 
party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."[20] The award of prejudgment interest is a determination within the discretion of the trial court and will not be reversed absent an abuse of discretion.[21]
 {¶ 45} In this case, the trial court found that Wynn had made a good-faith effort to settle, but that Gilbert had not. Wynn initially demanded $575,000, and Gilbert's only settlement offer came after trial — when the jury had the case. And even then he only offered $100,000. Wynn's medical bills totaled over $113,000. The jury returned a damage award of $1,500,000.
 {¶ 46} In granting prejudgment interest, the trial court noted that Gilbert "beyond question, failed to rationally evaluate his risk and potential liability." The court further stated that the probability of Gilbert's prevailing on liability was minimal: "[Gilbert] performed a procedure that put [Wynn] in extreme distress. An independent physician corrected [Gilbert's] negligence. Nevertheless, [Gilbert] and his friend insisted that he ha[d] done the procedure properly and not as the second surgeon found it despite the fact that no other surgery was involved. [Wynn's] extreme problems began with [Gilbert's] negligent act and [were] corrected with the second surgery. I have no idea what made [Gilbert] think he could prevail on liability. Simply because he was able to find an `expert' to testify for him is not enough."
 {¶ 47} The court also found that Gilbert did not make a good-faith effort to settle: "After the case went to the jury, [Gilbert] made his first offer to settle the case. The offer was for less than the medical specials incurred by [Wynn.] This in spite of *Page 15 
virtually no evidence contradicting the testimony offered by [Wynn] that she was in agony for months after [Gilbert's] negligent act. * * * The motion for prejudgment interest is granted." We could not have said it better, so we further sayeth naught.
 {¶ 48} It was not an abuse of discretion to grant prejudgment interest. In fact, it might have been abuse not to. Gilbert's assignment of error challenging the trial court's grant of prejudgment interest is overruled.
 X. Leading Question on Direct Examination {¶ 49} Gilbert also alleges error on the trial court's part in allowing, over his objection, Wynn's counsel to ask the following question:
 {¶ 50} "[Plaintiff's Counsel] MS. BARBARA JACOBSEN: Assuming that the expert that comes into this court on behalf of the defense is Dr. Donald Hura, and assume for the sake of discussion he is going to come in and testify in this case, you have reviewed records of Dr. Hura as an expert, haven't you?
 {¶ 51} "[Plaintiffs Witness] DR. SCHIRMER: I have been asked on two occasions to review records to defend Dr. Hura in medical negligence cases."
 {¶ 52} Gilbert asserts that Schirmer's testimony was irrelevant and unfairly prejudicial to the defense. He adds that the testimony admitted on direct opened the door to the following colloquy on cross-examination:
 {¶ 53} "[Plaintiff's Counsel] MR. GLENN WHITAKER: Dr. Schirmer is a well qualified surgeon, isn't he, sir?
 {¶ 54} "[Defense Witness] DR. DONALD HURA: I don't know much about Dr. Schirmer.
 {¶ 55} "[Plaintiff's Counsel] MR. GLENN WHITAKER: Even though he served as your expert? *Page 16 
 {¶ 56} "[Defense Witness] DR. DONALD HURA: I was unaware of that."
 {¶ 57} Gilbert argues that the testimony wrongfully bolstered Schirmer's expertise in the eyes of the jury. This is a piddling quibble.
 {¶ 58} Evid. R. 611(C) codifies the common-law rule that leading questions should not be used during direct examination of a friendly witness, except as necessary to develop the testimony.[22] But the trial court has discretion to allow leading questions on direct examination.[23] And its discretion will not be overturned on appeal absent a clear abuse of that discretion.[24]
 {¶ 59} Questioning Schirmer about whether he had reviewed Hura's cases in previous malpractice actions was probative of Schirmer's expertise and credibility to testify in this case. And the value of this testimony outweighed any perceived unfair prejudice to Gilbert.
 {¶ 60} We hold that Gilbert has failed to make a showing of prejudice or clear injustice that would warrant appellate intervention. And our review of the record fails to reveal any clear abuse of discretion by the trial court. Even if error on the trial court's part is assumed, it was harmless and does not warrant a new trial. Accordingly, we hold that the trial court did not abuse its discretion by allowing a leading question on direct examination of a friendly witness.
 XI. Cross-examination of Gilbert's Expert {¶ 61} Gilbert next maintains that on cross-examination the trial court improperly allowed Wynn's counsel to question defense expert Dr. Hura about prior *Page 17 
lawsuits. Specifically, Wynn's counsel asked, "[T]here have been a couple of situations in which you have either been sued or were threatened with suit yourself, correct?" The trial court overruled the defense's objection, and without waiting for an answer, Wynn's counsel continued to ask "[h]ow many times all together?" This time the trial court sustained the objection and the question was withdrawn. Gilbert argues that the testimony was irrelevant and that, with the first objection overruled, Wynn was able to inappropriately taint the perceived qualification of Dr. Hura.
 {¶ 62} Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.[25] The evidence was relevant and probative of Hura's potential bias against malpractice claimants, and admission of this relevant evidence did not unfairly prejudice Gilbert. This assignment of error is overruled.
 XII. Commonality of Insurance {¶ 63} Gilbert also charges the trial court with error in allowing Wynn to cross-examine Hura regarding the commonality of insurance between Hura and Gilbert. Based on the Ohio Supreme Court's holding inEde v. Atrium S. OB-GYN, Inc., Gilbert's assignment of error is meritless and overruled.[26]
 XIII. Quotient Verdict {¶ 64} Gilbert next argues that the trial court abused its discretion by failing to instruct the jury regarding quotient verdicts. But there is no evidence that the jury reached its award as a result of a quotient verdict, or that the trial court abused its *Page 18 
discretion in refusing to instruct the jury on quotient verdicts. And as we have already held, the $1,500,000 award was wholly supported by the evidence in the record.
 XIV. No Merit {¶ 65} At trial, Wynn presented an astounding array of evidence showing that Gilbert had not met the standard of care. The jury agreed; the trial court agreed; we agree. The trial court wisely granted prejudgment interest. Gilbert's assignments of error are meritless. Accordingly, we affirm the trial court's judgment.
Judgment affirmed.
HENDON and CUNNINGHAM, JJ., concur.
[1] See Pesek v. Univ. Neurologists Assn. Inc., 87 Ohio St.3d 495,501, 2000-Ohio-483, 721 N.E.2d 1011.
[2] See id.
[3] See Hollingsworth v. Time Warner Cable, 168 Ohio App.3d 658,2006-Ohio-4903, 861 N.E.2d 580, at ¶ 26.
[4] See Bowden v. Annenberg, 1st Dist. No. C-040499,2005-Ohio-6515, at ¶ 31, citing Snyder v. Stanford (1968),15 Ohio St.2d 31, 238 N.E.2d 563, paragraph one of the syllabus.
[5] See id., quoting Golfus v. Davidson, 79 Ohio St.3d 116,1997-Ohio-401, 679 N.E.2d 1099, syllabus.
[6] See id. at ¶ 88, quoting Pesek, supra (internal quotations and citations omitted).
[7] See, Pesek, supra (internal quotations omitted and emphasis added). See, also, Bowden, supra, at ¶ 35.
[8] Roetenberger v. Christ Hosp. Anesthesia Assocs. ofCincinnati, 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, at ¶ 9.
[9] See Fehrenbach v. O'Malley, 164 Ohio App.3d 80, 2005-Ohio-5554,841 N.E.2d 350, quoting Clark v. Doe (1997), 119 Ohio App.3d 296,695 N.E.2d 276.
[10] See id. at ¶ 25.
[11] See Hollingsworth, supra.
[12] See Carter v. Simpson (1984), 16 Ohio App.3d 420, 423,476 N.E.2d 705; see, also, Litchfield v. Morris (1985), 25 Ohio App.3d 42,44, 495 N.E.2d 462.
[13] See Civ.R. 59(A)(4); see, also, Hollingsworth, supra.
[14] See Mansfield Ry., Light Power Co. v. Barr (1914),2 Ohio App. 367.
[15] See Betz v. Timken Mercy Med. Ctr. (1994), 96 Ohio App.3d 211,644 N.E.2d 1058.
[16] See, e.g., Litchfield, supra.
[17] See Galayda v. Lake Hosp. Sys., Inc., 71 Ohio St.3d 424, 427,1994-Ohio-64, 644 N.E.2d 298; see, also, Kalain v. Smith (1986),25 Ohio St.3d 157, 160, 495 N.E.2d 572.
[18] See Kalain, supra, 25 Ohio St.3d at 159.
[19] See R.C. 1343.03(C).
[20] See Kalain, supra.
[21] See Scioto Mem. Hosp. Assn., Inc. v. Price Waterhouse,74 Ohio St.3d 474, 479, 1996-Ohio-365, 659 N.E.2d 1268.
[22] See, also, State v. Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084,854 N.E.2d 1038, at ¶ 138.
[23] See Drummond, supra, citing State v. D'Ambrosio,67 Ohio St.3d 185, 190, 1993-Ohio-173, 616 N.E.2d 909.
[24] See Chonich v. Wayne County Community College (C.A.6, 1989), 874 F.2d 359, 368; see, also Drummond, supra.
[25] See Evid.R. 401.
[26] 71 Ohio St.3d 124, 128, 1994-Ohio-424, 642 N.E.2d 365; see, also,Fehrenbach v. O'Malley, 164 Ohio App.3d 80, 2005-Ohio-5554,841 N.E.2d 350, at ¶ 37. *Page 1