BLAIR, Appellant,

v.

McDONAGH, Appellee, et al.

[Cite as *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–070238.

Decided July 25, 2008.

Dinsmore & Shohl, L.L.P., Lawrence Elleman, Timothy S. Mangan, Deborah DeLong, and Sean P. Callan, for appellant.

Taft, Stettinius & Hollister, L.L.P., R. Joseph Parker, John B. Nalbandian, Aaron M. Herzig, Bruce J.L. Lowe, and Stephen H. Jett, for appellee.

Dinkelacker, Judge.

## I. Facts and Procedure

{¶ 1} Plaintiff-appellant, Kevin Blair, appeals the judgment entered upon a jury's verdict in favor of defendant-appellee, Kevin McDonagh. He also appeals the trial court's decision overruling his motions for a judgment notwithstanding the verdict ("JNOV"), for a new trial, and for remittitur. We affirm the trial court's judgment, except for the award of punitive damages. We remand the case to the trial court to determine whether the award of punitive damages was excessive.

### A. Background and Origin of Claddagh

{¶ 2} McDonagh is a businessman from Ireland who owned Supermac's, a large, successful restaurant chain in Ireland. In 1997, he hired Blair, a native of Ohio, as director of operations for Supermac's. Blair and McDonagh got along well and became friends. Due to his wife's homesickness, Blair decided to return home.

{¶ 3} Blair and McDonagh decided to open a series of Irish-pub-themed restaurants in the midwestern United States. In 2001, they signed the operating agreement for Claddagh Employee Leasing. They later changed the name of the company to Claddagh Development Group, L.L.C.

### B. The Operating Agreement

{¶ 4} The agreement provided that Blair and McDonagh were both "members" of the company. It stated that each of them had provided a capital contribution of $1,000 and that each owned 50 percent of the common units. Blair was the general manager and tax-matters partner and received a salary. He ran the day-to-day operations and had broad authority to act without McDonagh's input. The agreement obligated him to provide annual financial reports and tax information and to give McDonagh access to Claddagh's books and records "at all reasonable times" and on reasonable notice.

### C. Funding and Declining Sales

{¶ 5} Claddagh opened its first restaurant in Indianapolis in 2001. By 2006, it had expanded to 17 restaurants across the Midwest. The pubs generally did well when they first opened but had declining sales over time. By 2004, Claddagh was regularly behind in paying its vendors and other creditors. Those creditors had sued it for default on a number of debts, and it had accrued large tax obligations.

{¶ 6} From 1999 to 2004, McDonagh advanced approximately $20 million to Claddagh. McDonagh contended that those advances were loans to the company. Blair contended that they were capital contributions. Part of the money came from personal loans that McDonagh had taken out in his own name. McDonagh asked Blair for information about Claddagh's financial condition. Blair was not forthcoming with that information. At the end of 2004, because Blair had not sent payments on the loans in some time, McDonagh told Blair that he would not be advancing any more funds. He also told Blair that if he could get money elsewhere, he should "feel free to do so."

{¶ 7} Blair attempted to obtain a line of credit from Fifth Third Bank that was to be secured by Claddagh's assets. McDonagh refused to sign the loan documentation. According to McDonagh, Blair attempted to hide the loan terms. Blair sent him only two pages of the entire loan agreement, and McDonagh would not sign without seeing the entire agreement. Further, the bank loan would have subordinated McDonagh's loans to the bank's security interest. Because McDonagh would not sign the loan documentation, the bank refused to loan money to Blair.

### D. "Impasse Buy–Sell" Provision

{¶ 8} Subsequently, Blair sought to invoke the "Impasse Buy–Sell" provision in the operating agreement to force McDonagh to sell his interest in the company to Blair. The agreement stated that if a dispute arose between the members over seven enumerated "management matters," the members would submit the issue to mediation. If mediation was unsuccessful, the mediator could declare an impasse.

{¶ 9} Then a member could invoke the "Impasse Buy–Sell" provision. The "initiating member" would set a value on the company. The "receiving member" would have 60 days to decide whether to purchase the initiating member's shares or to sell his shares to the initiating member based on the valuation. The agreement stated that "[e]lection by the Receiving Member shall be mandatory, and a failure by the Receiving Member to make an election with the sixty-day period shall conclusively mean that the Receiving Member has elected to sell at the price stated."

{¶ 10} Without declaring that a dispute over a management matter existed or asking that the dispute be submitted to mediation, Blair sent McDonagh a letter invoking the "Impasse Buy–Sell" provision. He set the value of the company at $42 million. Because McDonagh had advanced $20 million to the company, the remaining interest would be $22 million. Thus, each member's interest in the company would be approximately $11 million. Blair knew that if McDonagh chose to sell, Blair would have to pay $31 million to cover McDonagh's advances

and his interest in the company. If McDonagh chose to buy, he would pay Blair $11 million.

{¶ 11} Blair admitted that he never had $31 million or a financial backer willing to give him that amount of money. He contended that the dispute between him and McDonagh had scared off all potential investors. McDonagh contended that no dispute over a management matter existed and that Blair had not followed the terms of the operating agreement.

### E. The Lawsuit

{¶ 12} Blair subsequently filed suit against McDonagh and Claddagh. He alleged causes of action for breach of contract, breach of fiduciary duty, breach of an implied covenant of good faith and fair dealing, and fraud. He sought a declaratory judgment that McDonagh was contractually obligated under the terms of the operating agreement to transfer his interest in Claddagh to Blair, and that the $20 million that McDonagh had advanced to Claddagh represented capital contributions and not loans. He also sought an injunction, compensatory damages, and punitive damages.

{¶ 13} McDonagh filed a counterclaim against Blair in which he alleged causes of action for breach of contract, breach of a duty of good faith and fair dealing, and breach of fiduciary duty. He sought an accounting, dissolution of the company, and a declaratory judgment declaring the rights and obligations of the parties under the operating agreement and that the $20 million he had advanced to Claddagh represented loans and not capital contributions. He also sought compensatory and punitive damages.

{¶ 14} McDonagh filed cross-claims against Claddagh asking for repayment of loans, an accounting, the appointment of a receiver, and dissolution of the company. Claddagh, in turn, filed various cross-claims against McDonagh, including a request for a declaratory judgment that all of McDonagh's advances to the company were capital contributions, not loans.

{¶ 15} The trial court eventually ordered the parties to mediate their dispute as required by the operating agreement. It also ordered Blair to provide McDonagh with access to Claddagh's books and records.

{¶ 16} After the mediator declared an impasse, Blair presented McDonagh with a letter invoking the Impasse Buy–Sell provision and setting the value of the members' interests at $25 million, exclusive of McDonagh's advances. But Blair again did not have the money or financial backing to purchase McDonagh's interest.

## F. Improper Use of Company Funds

{¶ 17} Before the mediation, McDonagh hired BBP Partners, led by Robert Brlas, to audit Claddagh's books and records and to determine its value. BBP sent accountants to Claddagh's headquarters in Cleveland, and they reviewed documents for over four months at a cost of over $400,000. According to Brlas, Blair and his chief financial officer, Michael Ely, obstructed BBP's efforts. Ely even took documents from BBP's workspace and shared them with Blair and his counsel.

{¶ 18} The accountants discovered that Blair had used Claddagh funds for his personal expenses. Blair contended that he had used Claddagh's credit cards for convenience but that he had always marked the expenses "personal" and had made sure that they went into an account marked "Kevin Blair Receivables" as a debt to the company. But BBP accountants identified $32,000 in personal expenses, only $10,000 of which appeared on Claddagh's books and none of which was ever repaid.

{¶ 19} The accountants also identified an additional $140,000 in credit-card charges by Blair that were likely personal. But they could not definitively state that those charges were personal, because Blair had never provided the necessary information that they had requested. The charges included purchases of groceries, clothing, sunglasses, and a trip to the Caribbean.

{¶ 20} In July 2003, Blair used $67,000 in Claddagh funds for a down payment on a $500,000 home. In December of that same year, he made a distribution of $80,000 to each member at a time when Claddagh had no distributable cash flow and had "repaid" the down payment on Claddagh's books.

{¶ 21} Blair also used Claddagh funds to start the "Kevin and Stacey Blair Family Athletic Scholarship" for hockey players at Ohio State University. He contended that Supermac's had often sponsored and supported athletic teams in Ireland, but those donations were made in the name of the company. Blair contended that the use of his name on the scholarship instead of Claddagh's was a mistake.

{¶ 22} Blair had Claddagh's corporate law firm reserve trademarks for other potential restaurant concepts and paid for those services with Claddagh funds. The trademarks were assigned to Blair personally and not to Claddagh. He also used Claddagh funds to pay his lawyers and expert witnesses to carry on his litigation against McDonagh. Blair's counsel received $40,000 from Claddagh for the purpose of suing McDonagh.

## G. Declaratory Judgment—Loans, Not Capital Contributions

{¶ 23} The issue whether McDonagh's advances were loans or capital contributions was tried to the court. The remaining issues proceeded to a jury trial. At

the close of the evidence, but before closing argument and the jury charge, the trial court ruled on the parties' requests for a declaratory judgment. It found that the $20 million that McDonagh had advanced to Claddagh represented loans and not capital advances. The court instructed the jury that the advances were loans.

## H. Jury Verdicts for McDonagh

{¶ 24} A jury returned verdicts in favor of McDonagh on all of Blair's claims against him. It found for McDonagh and against Blair on McDonagh's breach-of-contract and breach-of-fiduciary-duty claims. It awarded McDonagh $400,000 in compensatory damages for the breach of contract. It awarded him $228,000 in compensatory damages and $1,500,000 in punitive damages for the breach of fiduciary duty. The jury also found for McDonagh on all of Claddagh's cross-claims against him.

{¶ 25} The trial court overruled Blair's motion for JNOV, for a new trial, and for remittitur. In this appeal, Blair presents six assignments of error for review. Claddagh, which is now in bankruptcy and represented by a bankruptcy trustee, has not appealed.

## II. Expert Testimony and Questionable Expenses

{¶ 26} In his first assignment of error, Blair contends that the trial court erred in admitting speculative testimony into evidence and in allowing counsel to argue based on that testimony. He asserts that the court should not have allowed Brlas to testify about the $140,000 that he could not identify as personal or business expenses. He also argues that McDonagh's counsel improperly argued to the jury that it should award an amount of damages that included the $140,000. This assignment of error is not well taken.

### A. Expert Testimony Was not Speculative

{¶ 27} Evid.R. 702(C) states that an expert witness's testimony must be "based on reliable, scientific, technical or other specialized information." Whether an expert's opinion is admissible depends on whether the principles and methods employed by the witness to reach his opinion were reliable and not "whether his conclusions are correct." [1] Thus, the witness's knowledge "must not be based on subjective belief or unsupported speculation." [2] But the witness need not "utter any 'magic language'; i.e., that his opinion was within the

---

1. *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735; *State v. Campbell* (Mar. 15, 2002), 1st Dist. Nos. C–010567 and C–010596, 2002 WL 398029.

2. *Campbell.*

reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience." [3]

{¶ 28} The trial court has broad discretion in the admission of evidence, including expert testimony. We will not reverse the trial court's decision absent an abuse of discretion.[4]

{¶ 29} Blair's contention that Brlas's testimony regarding the questionable expenses was not reliable is misplaced. Brlas was well qualified to testify as an expert in forensic accounting. His testimony concerned matters within his knowledge and expertise as a certified public and forensic accountant. In general, no dispute existed that his methods were reliable. He and his subordinates had spent months reviewing Claddagh's general ledger and other available documents.

{¶ 30} In discussing the questionable expenses, Brlas was simply reporting what he had found. He was not asserting an opinion. He said that he could not offer an opinion because Blair had provided insufficient documentation regarding those expenses. Brlas essentially refused to speculate about the expenses absent further information. Under the circumstances, we cannot hold that the trial court's decision to allow his testimony into evidence was so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion.[5]

## B. Closing Argument

{¶ 31} Blair also contends that McDonagh's counsel improperly argued about the questionable expenses. We agree that the argument was improper, but we cannot hold that it resulted in reversible error.

{¶ 32} Closing arguments present counsel with the opportunity to comment on the evidence and the reasonable inferences to be drawn from the evidence.[6] Counsel has wide latitude in closing argument, but arguments that are not supported by the evidence are improper.[7]

---

**3.** *Ochletree v. Trumbull Mem. Hosp.*, 11th Dist. No. 2005–T–0015, 2006-Ohio-1006, 2006 WL 533502, ¶ 43.

**4.** *State v. Awkal* (1996), 76 Ohio St.3d 324, 331–332, 667 N.E.2d 960; *State v. Rosemond*, 1st Dist. No. C–060578, 2007-Ohio-6333, 2007 WL 4208725, ¶ 15.

**5.** See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 218, 5 OBR 481, 450 N.E.2d 1140; *Thomas v. Thomas*, 171 Ohio App.3d 272, 2007-Ohio-2016, 870 N.E.2d 263, ¶ 11.

**6.** *Roetenberger v. Christ Hosp.*, 163 Ohio App.3d 555, 2005-Ohio-5205, 839 N.E.2d 441, ¶ 9.

**7.** *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 501, 721 N.E.2d 1011; *Wynn v. Gilbert*, 1st Dist. No. C–060457, 2007-Ohio-2798, 2007 WL 1650021, ¶ 30; *Roetenberger* at ¶ 9.

{¶ 33} In closing argument, McDonagh's counsel began discussing Brlas's testimony. Blair's counsel objected. The trial court overruled the objection, stating, "Go ahead, sir, of what's in evidence." Counsel discussed Brlas's testimony some more and then stated, "You'll have to make up your own judgment whether an additional $140,000 should be included [in damages for breach of fiduciary duty] or not." Blair's counsel did not object to that portion of the argument.

{¶ 34} Generally, a party must show damages with reasonable certainty and cannot leave them to conjecture or speculation.[8] Brlas's testimony showed that the $140,000 of expenses was speculative, and, therefore, those expenses could not be part of a damages award. Counsel could certainly have discussed Brlas's testimony about the expenses as it related to credibility, for example. But counsel's argument that the jury could include the expenses in a damages award was improper.

{¶ 35} Nevertheless, counsel's remarks did not rise to the level of plain error, as they did not affect the basic fairness and integrity of the proceedings.[9] They certainly did not rise to the level of the sort of gross and abusive tactics that we have found to be plain error in our recent cases.[10]

{¶ 36} Blair contends that the jury necessarily included the $140,000 in its damages award. But McDonagh presented substantial evidence of damages, unrelated to the $140,000 in questionable expenses, that would have allowed the jury to award $228,000. Without more specific jury interrogatories that explained the basis of the jury's damages award, we cannot hold that counsel's argument was prejudicial.[11] Consequently, we overrule Blair's first assignment of error.

### III. Breach of Fiduciary Duty

{¶ 37} In his second assignment of error, Blair contends that the trial court erred in denying his motion for JNOV or for a new trial regarding McDonagh's claim for breach of fiduciary duty. He argues that McDonagh's claim for breach

---

**8.** *Maupin v. Rodney Griffin & Duffran, Inc.,* 1st Dist. No. C–060329, 2007-Ohio-2389, 2007 WL 1452588, ¶ 14.

**9.** See *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus; *In re Etter* (1998), 134 Ohio App.3d 484, 492, 731 N.E.2d 694.

**10.** See, e.g., *Thamann v. Bartish,* 167 Ohio App.3d 620, 2006-Ohio-3346, 856 N.E.2d 301, ¶ 5–47; *Roetenberger* at ¶ 4–12.

**11.** See *CVG Shops, Inc. v. Fifth Third Ctr. Assoc.* (Dec. 4, 1996), 1st Dist. No. C–960091, 1996 WL 691449; *Nott v. Homan* (1992), 84 Ohio App.3d 372, 378, 616 N.E.2d 1152.

of fiduciary duty was actually Claddagh's claim and that only the corporation could raise it. This assignment of error is not well taken.

## A.  Waiver and Invited Error

{¶ 38} Circumstances exist in which a shareholder in a close corporation may bring an individual action.[12]  But we need not reach that issue.  Even if it were improper for McDonagh to bring the action individually, Blair never raised the issue until he filed his motion for JNOV or for a new trial.  A party may not raise an issue, particularly one that is determinative of a claim or cause of action, in a posttrial motion.[13]  The parties have a responsibility to raise issues at the earliest possible opportunity.[14]

{¶ 39} Further, Blair raised his own claim of breach of fiduciary duty.  Under his logic, he, too, should have brought it in the name of the company.  Instead, he named Claddagh as a defendant.  He did not object to the instructions on breach of fiduciary duty and the related damages instructions to the jury.  To the contrary, he requested them and argued his case on that basis.  Consequently, any error was invited error.  Under the invited-error doctrine, a party may not take advantage of an error that the party invited or induced the trial court to make.[15]

{¶ 40} The record is clear that Blair followed a specific trial strategy.  Only when that strategy backfired and the jury found against him did he raise numerous issues.  "A court of appeals should be especially cautious to find plain error when a party may have made a strategic decision that it subsequently regrets."[16]  Consequently, we overrule Blair's second assignment of error.

---

12.  See *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108–110, 548 N.E.2d 217; *Carlson v. Rabkin*, 152 Ohio App.3d 672, 2003-Ohio-2071, 789 N.E.2d 1122, ¶ 9; *Gensemer v. Hallock* (1997), 125 Ohio App.3d 84, 91–92, 707 N.E.2d 1156; *Cousins v. Brownfield* (1992), 83 Ohio App.3d 782, 790–791, 615 N.E.2d 1064; *Murray & Murray Co., L.P.A., Profit–Sharing Plan & Trust v. Performance Industries, Inc.* (C.P.1998), 93 Ohio Misc.2d 10, 17–18, 701 N.E.2d 475.

13.  *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, ¶ 120–150; *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 273, 642 N.E.2d 395.

14.  See *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 98–99, 706 N.E.2d 1261.

15.  *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus; *Travelers Cas. & Sur. Co. v. Cincinnati Gas & Elec. Co.*, 169 Ohio App.3d 207, 2006-Ohio-5350, 862 N.E.2d 201, ¶ 12.

16.  *Turner v. Bob Ross Buick, Inc.* (Nov. 22, 1993), 2d Dist. No. 13809, 1993 WL 485256.

## B. Weight of the Evidence

{¶ 41} In his sixth assignment of error, Blair contends that the trial court erred in overruling his motion for JNOV and for a new trial on his claim for breach of fiduciary duty. He argues that the evidence unequivocally showed that McDonagh had breached his duty of good faith and fair dealing by refusing to consent to the line of credit that Blair had negotiated with Fifth Third Bank, and that McDonagh knew was necessary for the good of the company. This assignment of error is not well taken.

{¶ 42} A limited-liability company, like a partnership, involves a fiduciary relationship.[17] That relationship imposes on the members a duty to exercise the utmost good faith and honesty in all dealings and transactions related to the company.[18]

{¶ 43} Similarly, the parties to a contract owe each other a duty of good faith and fair dealing.[19] "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Bad faith may be "the abuse of a power to specify terms, [or] interference with or a failure to cooperate in the other party's performance." [20]

{¶ 44} We review the decision to grant or deny a motion for JNOV de novo. A JNOV is proper if, upon viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could come to but one conclusion in favor of the moving party.[21] But where substantial evidence exists to support the nonmoving party's side of the case, upon which reasonable minds could reach different conclusions, the court must deny the motion.[22] We review a ruling on a motion for a new trial under an abuse-of-discretion standard.[23]

---

17. *McConnell v. Hunt Sports Ent.* (1999), 132 Ohio App.3d 657, 687, 725 N.E.2d 1193; *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 130, 572 N.E.2d 198.

18. See *Lorain Natl. Bank* at 130, 572 N.E.2d 198; *Brose v. Bartlemay* (Apr. 16, 1997), 1st Dist. No. C–960423, 1997 WL 180287.

19. *Littlejohn v. Parrish,* 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 21.

20. Id. at ¶ 26, quoting Restatement of the Law 2d, Contracts (1981), Section 205, Comments a and d.

21. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3–4; *Peters v. Lohr,* 1st Dist. No. C–060230, 2007-Ohio-7062, 2007 WL 4554014, ¶ 4.

22. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 504 N.E.2d 19.

23. *Wynn,* 2007-Ohio-2798, 2007 WL 1650021, at ¶ 36.

{¶ 45} McDonagh presented substantial evidence showing that he had acted in good faith and that he had not breached his fiduciary duty. The evidence showed that McDonagh had withheld his consent for the loan for legitimate reasons, the most important of which was that Blair had refused to provide necessary financial information to evaluate the business and the necessity for the loan. Further, the Fifth Third loan would have subordinated McDonagh's loans. Under the circumstances, he was not acting in bad faith when he failed to consent to the loan.

{¶ 46} Blair is simply arguing that his version of events was more credible. But in considering a motion for JNOV, a court does not weigh the evidence or test the credibility of the witnesses.[24] Consequently, we cannot hold that the trial court erred in overruling Blair's motion for JNOV or that the court abused its discretion in overruling his motion for a new trial. We overrule Blair's sixth assignment of error.

## IV. Loans v. Capital Contributions

{¶ 47} In his fifth assignment of error, Blair contends that the trial court erred in ruling that McDonagh's advances to Claddagh were loans rather than capital contributions. He argues that under the language of the operating agreement, the advances were capital contributions. This assignment of error is not well taken.

### A. Operating Agreement

{¶ 48} The interpretation of a written instrument is, in the first instance, a matter of law for the court. If it is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations; it must simply give effect to the contractual language.[25] But if the provisions of a contract are ambiguous, an issue of fact exists.[26]

{¶ 49} In the construction of a written instrument, a court's primary objective is to give effect to the parties' intent, which can be found in the

---

24. *Osler,* 28 Ohio St.3d at 347, 28 OBR 410, 504 N.E.2d 19; *Peters,* 2007-Ohio-7062, 2007 WL 4554014, at ¶ 4.

25. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920; *Fifth Third Bank v. Ducru Ltd. Partnership,* 1st Dist. No. C–050564, 2006-Ohio-3860, 2006 WL 2104788, ¶ 14.

26. *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271; *Fifth Third,* 2006-Ohio-3860, 2006 WL 2104788, at ¶ 14.

language they chose to employ. The court should read the contract as a whole and gather the intent of each part from the whole.[27]

{¶ 50} Section 2 of the operating agreement is entitled "Capital Contributions." Section 2(b) states that "[t]he Members contemplate that the additional requirements of the Company shall be met through a bank loan and/or capital contribution by McDonagh. The Company is hereby authorized and directed to accept additional capital contributions from McDonagh in such amount as the Members deem necessary or appropriate, in consideration for which the Company is authorized and directed to issue to McDonagh Preferred Units, the price of which shall be $1,000 per Unit."

{¶ 51} Under Section 3(g) of the agreement, the distributable cash flow of the company would be calculated at least annually at the end of each year and distributed to the members within 90 days. If the company made a distribution to the members, a holder of preferred units would be paid in full before the holders of the common units.

{¶ 52} Blair contends that these provisions showed that the parties contemplated that any advances by McDonagh would be treated as capital contributions rather than loans, and that if a loan was required, both members had to agree to its terms. We disagree.

{¶ 53} Section 2(d) provided that "[n]otwithstanding anything contained herein, no Member shall be required to make any capital contribution or loan to the Company after the date hereof. If the General Manager determines that the Company requires additional funds, subject to Section 6 of this Agreement, any Member may, but shall not be obligated to, advance such funds." Under the plain language of this section, McDonagh did not have to provide loans or capital, but could provide either if he so chose. Consequently, the operating agreement did not show that McDonagh's advances were necessarily capital contributions.

## B. Evidence of Loans

{¶ 54} Blair also argues that even if the advances were not capital contributions under the agreement, no meeting of the minds occurred as to any of the terms of an oral loan agreement, and that, therefore, no binding contract existed. Again, we disagree.

{¶ 55} A meeting of the minds is an essential prerequisite to the enforcement of an oral contract.[28] The terms of a contract may be determined

---

**27.** *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519; *Fifth Third,* 2006-Ohio-3860, 2006 WL 2104788, at ¶ 13.

**28.** *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16; *LaPoint v. Templeton,* 6th Dist. No. F–07–014, 2008-Ohio-1792, 2008 WL 1700522, ¶ 34.

from the "words, deeds, acts, and silence of the parties." [29]

{¶ 56} R.C. 2721.10 provides that when a declaratory-judgment action involves an issue of fact, the court may determine that issue in the same manner that it determines issues of fact in other civil actions.[30] Our inquiry, then, involves whether the trial court's judgment was against the manifest weight of the evidence.[31] A reviewing court will not reverse judgments supported by some competent, credible evidence going to all essential elements of the case as being against the manifest weight of the evidence.[32]

{¶ 57} The evidence showed that Blair had treated the advances as loans on Claddagh's tax returns. He had also taken interest deductions on his personal income taxes based on Claddagh's net operating losses, which were due, in part, to the amounts owed on McDonagh's advances. McDonagh and Supermac's paid Irish taxes on the accrued interest owed on the loans, even after Blair had stopped making payments, because McDonagh expected the loans and interest to be repaid and had to report the expected interest income.

{¶ 58} Blair made payments to McDonagh from 2000 to 2004. He wrote "loan" or "loan repayment" or similar language on the memo line of the checks. Blair wrote in a February 2004 letter that "Pat and I each own one-half or fifty percent of each of the companies. The financing provided by Pat to the companies was in a series of loans." Claddagh's financial statements and general ledger consistently recorded McDonagh's payments as loans to the company.

{¶ 59} Further, one of Blair's accountants specifically testified that McDonagh's advances were properly characterized as loans. After the litigation commenced, Blair's counsel tried to get the accountant to characterize the loans as capital contributions on the financial statements. The accountant refused.

{¶ 60} Because competent, credible evidence supported the trial court's determination that the parties had agreed that the advances were loans, this court will not reverse the court's decision. Consequently, we overrule Blair's fifth assignment of error.

---

**29.** *Kostelnik,* at ¶ 15, quoting *Rutledge v. Hoffman* (1947), 81 Ohio App. 85, 36 O.O. 405, 75 N.E.2d 608.

**30.** *Erie Ins. Group v. Fisher* (1984), 15 Ohio St.3d 380, 381–382, 15 OBR 497, 474 N.E.2d 320; *Sterling Drug, Inc. v. Wickham* (1980), 63 Ohio St.2d 16, 18, 17 O.O.3d 10, 406 N.E.2d 1363.

**31.** *Cincinnati Ins. Co. v. Irwin Co.* (Dec. 22, 2000), 1st Dist. Nos. C–000107 and C–000120, 2000 WL 1867297.

**32.** *Shemo v. Mayfield Hts.* (2000), 88 Ohio St.3d 7, 10, 722 N.E.2d 1018.

## C. Closing Argument about the Loans

■■■ {¶ 61} In his third assignment of error, Blair contends that McDonagh's closing arguments were improper. He argues that the trial court should not have allowed McDonagh's counsel to use the trial court's ruling that the advances were loans to argue that Blair was not truthful when he testified that the loans were capital contributions. He further argues that the trial court should have granted his motion for a new trial on this basis. This assignment of error is not well taken.

■■■ {¶ 62} The record shows that Blair failed to object to the arguments he now contends were improper. Even when a party fails to object, the trial court must act to correct any prejudicial effect when gross and abusive misconduct occurs.[33] But a trial court's duty to intervene does not apply when counsel's arguments are based on the evidence.[34]

{¶ 63} Our review of the record shows that, for the most part, McDonagh's arguments were fair comments on the evidence. Blair's credibility was at issue because of evidence showing that he had treated the advances as loans, although he repeatedly asserted at trial that they were capital contributions. Counsel mentioned the court's ruling only once in connection with Blair's credibility. Under the circumstances, we cannot hold that the argument was the sort of gross and abusive misconduct that required the court to intervene. The trial court did not abuse its discretion in allowing the argument or in overruling his motion for a new trial.[35] We overrule Blair's third assignment of error.

## V. Punitive Damages

{¶ 64} In his fourth assignment of error, Blair contends that the trial court erred in denying his motion for JNOV, a new trial, or remittitur on the award of punitive damages. He argues that McDonagh failed to present clear and convincing evidence of malice, that the award of punitive damages violated the statutory cap on such damages in R.C. 2315.21, and that the award violated his right to due process. This assignment of error has some merit.

### A. Actual Malice

■■■■ {¶ 65} An award of punitive damages may be appropriate on a claim

---

33. *Pesek,* 87 Ohio St.3d at 501, 721 N.E.2d 1011; *Roetenberger,* 2005-Ohio-5205, at ¶ 9.

34. *Wynn,* 2007-Ohio-2798, 2007 WL 1650021, at ¶ 34.

35. *Pesek* at 501, 721 N.E.2d 1011; *Wynn* at ¶ 17 and 30; *Joiner v. Simon,* 1st Dist. No. C–050718, 2007-Ohio-425, 2007 WL 286296, ¶ 45.

for breach of fiduciary duty upon a showing of malice.[36] "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." [37]

{¶ 66} In this case, the evidence showed that Blair had used corporate funds for his own purposes and that he had deliberately withheld documents to cover up his conduct. We hold that McDonagh presented evidence from which the jury could have reasonably found by clear and convincing evidence that Blair's actions had showed a conscious disregard for McDonagh's rights that had a great probability of causing substantial harm. Therefore, the evidence supported the jury's finding of malice.[38]

## B. Punitive–Damages Cap

{¶ 67} Blair also contends that the punitive-damages cap in R.C. 2315.21(D) applied in this case. But he relies on the current version of the statute that became effective on April 7, 2005. Several courts have held that this statute may not be applied retroactively.[39] Thus, a court cannot apply it to causes of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the effective date.[40]

{¶ 68} In this case, the claims warranting punitive damages arose well before the statute's effective date, starting in 2001 and continuing until after the lawsuit was filed in September 2005.[41] Therefore, the current version of R.C. 2315.21 can not be applied retroactively to that conduct.

---

36. See *Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621, ¶ 99–100; *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 301, 741 N.E.2d 155.

37. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174.

38. See *Burns* at ¶ 98–109.

39. *Arndt v. P & M Ltd.*, 11th Dist. Nos. 2007–P–0038 and 2007–P–0039, 2008-Ohio-2316, 2008 WL 2042831, ¶ 89; *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App.3d 23, 2008-Ohio-311, 884 N.E.2d 1130, ¶ 17–21; *Ullman v. Auto–Owners Mut. Ins. Co.* (S.D.Ohio 2007), 502 F.Supp.2d 737; *Kramer Consulting, Inc. v. McCarthy* (2006), S.D. Ohio No. C2–02–116, 2006 WL 581244.

40. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 104–106, 522 N.E.2d 489; *Uebelacker v. Cincom Sys., Inc.* (1992), 80 Ohio App.3d 97, 101, 608 N.E.2d 858; *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Servs., Inc.* (1992), 81 Ohio App.3d 591, 607–608, 611 N.E.2d 955.

41. See *Akron–Canton Waste Oil*, supra, at 607, 611 N.E.2d 955.

{¶ 69} The versions of the statute in effect during the time when the claims herein accrued had been enacted in response to an Ohio Supreme Court decision declaring a 1997 version unconstitutional in toto.[42] Those versions, which became effective on July 6, 2001, and November 7, 2002, contained no cap on punitive damages. Consequently, no cap applied in this case.

## C. Due Process

{¶ 70} Blair also contends that the punitive-damages award was excessive and violated his constitutional right to due process. McDonagh contends that Blair waived this issue, but our review of the record shows that he did raise it, although somewhat belatedly, in his reply memorandum in support of his motion for JNOV, for a new trial, and for remittitur.

{¶ 71} While this case was pending, the Ohio Supreme Court decided *Barnes v. Univ. Hosps. of Cleveland*,[43] in which it specifically applied recent United States Supreme Court cases on the issue.[44] In *Barnes*, the court set out three factors that must be considered in determining whether an award of punitive damages is excessive: "(1) the degree of reprehensibility of the party's conduct, (2) the relation of the punitive damages to the actual harm inflicted by the party, and (3) sanctions for comparable conduct."

{¶ 72} Since the trial court could not have considered these factors, we sustain Blair's fourth assignment of error in part. We reverse the award of punitive damages and remand the case to the trial court for the parties to present evidence on the three factors and for the trial court to determine if the punitive-damages award was excessive based on those factors.

## VI. Summary

{¶ 73} We overrule Blair's first, second, third, fifth, and sixth assignments of error. We affirm the trial court's judgment with respect to the issue of liability and the award of compensatory damages. But we sustain Blair's fourth assign-

---

42. See *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 17–18; *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraphs two and three of the syllabus.

43. *Barnes v. Univ. Hosps. of Cleveland*, 119 Ohio St.3d 173, 2008-Ohio-3344, 893 N.E.2d 142.

44. See *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585; *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001), 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674; *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809.

ment of error in part. We reverse the award of punitive damages and remand the cause for further proceedings in accordance with the terms of this decision.

Judgment affirmed in part
and reversed in part,
and cause remanded.

HILDEBRANDT, P.J., and PAINTER, J., concur.