[Cite as *Helms v. Whitney*, 2014-Ohio-2413.]

COURT OF APPEALS
HOLMES COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| DARRELL E. HELMS, ET. Al., | : | JUDGES: |
| | : | |
| | : | Hon. Sheila G. Farmer, P.J. |
| Plaintiffs - Appellees | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| -vs- | : | |
| | : | |
| THOMAS C. WHITNEY, ET. Al., | : | Case No. 13CA014 |
| | : | |
| | : | |
| Defendants - Appellants | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Holmes County
                             Court of Common Pleas, Case No.
                             12-CV-0145

JUDGMENT:                    Affirmed in part; Reversed in part

DATE OF JUDGMENT:            June 4, 2014

APPEARANCES:

For Plaintiffs-Appellees            For Defendants-Appellants

THOMAS D. WHITE                     ROBERT W. ECKINGER
CHRISTOPHER M. WHITE                Eckinger Law Offices, LTD.
ALYSSE L. GILES                     1201- 30th Street, N.W., Suite 101-B
White Law Office, Co.               Canton, OH 44709
209 N. Washington St.
Millersburg, OH 44654

*Baldwin, J.*

{¶1}    Defendants-appellants Thomas C. Whitney and Donald E. Ridgeway appeal from the November 6, 2013 Decision and Judgment Entry of the Holmes County Court of Common Pleas.

## STATEMENT OF THE FACTS AND CASE

{¶2}    Appellant Thomas Whitney is the permit owner of Crider Number 4 well, which is located on property owned by appellees Darrell and Dortha Helms. The well was completed in 1918.

{¶3}    In January of 1976, appellees and appellant Ridgeway[1] executed an oil and gas lease.  The lease, which was recorded in 1977,  stated that "[l]essee agrees to commence  a well on said premises within 6 months from this date  or pay Lessor …$34.00 for each 6 months thereafter until such well is commenced or the lease surrendered." Under the terms of the lease, the lease could be held if oil and gas was produced on the property and royalties were to be paid to appellees.  No new well was ever drilled on the premises.

{¶4}    On or about March 15, 1976, appellant Ridgeway transferred his rights under the lease and to the well to appellant Whitney.  The trial court found that, from 1976 to approximately the end of 2008, some oil and gas was produced and royalties were paid.

{¶5}    On July 16, 1981, appellees recorded an Affidavit of Non-Compliance with the Holmes County Recorder. Appellees, in their affidavit, indicated that they had not

---

[1] Appellant Ridgeway testified that he bought the well from Elvi and Charles Crider, who owned the land prior to appellees.

received any royalties under the lease, that there were no producing wells on the land in the lease and that the lease was null and void.

{¶6} In 2009, a storm blew a goat pen, which was owned by appellees, onto the electric utility pole which supplied electricity to the pump on the Cider Number 4 well. As a result, the pole broke and electric power to the well was disrupted. The parties agree that there was a disagreement between them regarding placement of a new electric pole. Appellants assert that appellees interfered with restoring electricity to the pump while appellees dispute this. According to appellant Whitney, a representative of the electric company came out to the property and designated where the pole needed to be set, but appellees would not allow the pole to be set there and the representative left. Without the new pole, appellants claim they were unable to produce the well.

{¶7} On April 3, 2012, the Ohio Department of Natural Resources Division of Mineral Resources Management (hereinafter "ODNR") conducted an inspection of the subject well after a complaint was received that the well was not producing. In its report, the ODNR found that the well was not producing and that no production had been reported since 2009 and that there was no identification on the tank or well. The ODNR further stated that the electricity had been disconnected and ordered appellant Whitney to plug, produce or sell the well by July 4, 2012. Appellants did not do so. A follow-up inspection was conducted on May 2, 2012. In its report, the ODNR stated that the well was still not producing and that there was still no identification. Following an inspection on July 11, 2012, the ODNR found that the well was "still not producable." No oil has been produced from the well since the storm in 2009. According to appellee Dortha Helm, appellees have not received any royalty payments since January of 2009. At the

bench trial in this matter, appellant Whitney agreed that the check in January of 2009 was the last royalty check and that there was still an electrical problem with producing the well. No oil has been produced from the well since the storm in 2009.

{¶8} In September or October of 2012, appellant Whitney painted identification on the tank.

{¶9} Thereafter, on November 28, 2012, appellees filed a complaint for declaratory judgment. Appellees, in their complaint, asked that various leases, including the one at issue in this case, be declared null and void[2]. The matter proceeded to a bench trial on July 19, 2013 and August 14, 2013. After the trial, the parties filed proposed findings of fact and conclusions of law.

{¶10} Pursuant to a Decision and Judgment Entry filed on November 6, 2013, the trial court found that it was not appellees' fault that production of the subject well had ceased and ordered that the subject lease was forfeited. The trial court ordered that the lease be cancelled of record. The trial court further stated, in relevant part, as follows: "pursuant to Ohio Revised Code section 1509.062 the Court feels that the well is inactive, has not been properly produced and therefore must be plugged immediately by the Defendants." The trial court ordered that the plugging be completed no less than four months from the date of the trial court's decision.

{¶11} Appellants now raise the following assignments of error on appeal:

{¶12} THE TRIAL COURT'S FINDING THAT THE APPELLEES DID NOT PREVENT THE APPELLANTS FROM PRODUCING THE CRIDER WELL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

---

[2] The trial court, in an Order filed on June 24, 2013, declared the other oil and gas leases to be null and void.

{¶13} THE TRIAL COURT'S FINDING THAT A GENERATOR COULD HAVE BEEN SUPPLIED BY THE APPELLANTS TO PRODUCE THE CRIDER WELL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} THE TRIAL COURT'S FINDING THAT A NEW ELECTRIC POLE WAS SET SOMETIME IN EITHER 2011 OR 2012 AND THAT POWER COULD HAVE BEEN RUN TO THE WELL AT THAT TIME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶15} THE TRIAL COURT'S ORDER THAT THE CRIDER WELL MUST BE PLUGGED WITHIN FOUR MONTHS OF THE COURT'S DECISION WAS CONTRARY TO LAW.

{¶16} THE TRIAL COURT'S FINDING THAT THE CRIDER WELL HAD AN INACTIVE STATUS PURSUANT TO R.C. 1509.062(A)(1) WAS CONTRARY TO LAW.

I, II III

{¶17} Appellants, in their first three assignments of error, challenge certain findings made by the trial court as being against the manifest weight of the evidence.

{¶18} We note that a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction Co.,* 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson,* 66 Ohio St.3d 610, 1993–Ohio–9, 614 N.E .2d 742. The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and

observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶19} While appellees argue that this Court should apply an abuse of discretion standard, we note that when a declaratory judgment action involves, as here, issues of fact, a manifest weight of the evidence standard is applicable. See, for example, *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377 (1st Dist).

{¶20} The trial court, in its November 6, 2013 Decision and Judgment Entry, found, in relevant part, as follows: "The Court finds that the parties both agree that there was a new electric line pole that was set up sometime in the year 2011 or 2012 and that power could have been run to the well at that time. In addition, the Court finds that even with the electric supply terminated that a generator could have been supplied by Defendants to produce this well.

{¶21} "The Court finds that it is not the fault of the Plaintiffs that production has been ceased."

{¶22} Appellants maintain that such findings are against the manifest weight of the evidence.

{¶23} There is no dispute that, after the storm blew the electric pole down, the parties were unable to agree where a new pole should be placed. Appellant Ridgeway testified that appellees did not want the pole in their yard. Appellee Dortha Helms testified that she did not want the pole to be put in the yard because of concerns that the pole placement would interfere with gas lines that her son put in. She testified that "I don't need it in my yard when he's got an acre around his well. " Trial Transcript at 53.

She further testified that she would not have minded if appellant put a pole in the pasture and that she wanted the pole put closer to the well. Appellant Darrell Helms testified that he disagreed with where appellants wanted the pole to be located. The following is an excerpt from his testimony:

{¶24}   Q. The uh, Ridgeway and Whitney stated that the, they had the utility company there to set a new pole and the Helms would not allow the electric company to set a pole there on their property…

{¶25}   Q:  Do you agree with that statement by them or you disagree with it or do you not know.

{¶26}   A:   Well he was wanting to set it.  I disagreed with it because why not over there instead of there.

{¶27}   Q:  Was the pole finally set?

{¶28}   A:   No it wasn't set.

{¶29}   Q:   But you didn't want it set where they wanted it.   You wanted it somewhere else?

{¶30}   A:   Well across the fence he wanted it in the yard to go up in the up to the gate and I got a gas line that runs through there.

{¶31}   Q:   This is the line that your son put in?

{¶32}   A:  Yes.

{¶33}   Q:   And you didn't want it near the gas line?

{¶34}   A:   Well I didn't want no pole setting there.  Why have a pole that close to the other pole?

{¶35}   Trial Transcript at 95.

{¶36}   He also testified that he did not want a pole near a bush in the yard and that putting the pole where appellants wanted would have affected the bush and the gas line put in by their son that went to appellees' house. According to appellant Darrell Helms, a pole could have been placed where the pole that blew down was located.

{¶37}   Appellants contend that appellee Darrell Helms, on or around October of 2012, placed a tractor on appellee's driveway while appellants were on the property, effectively blocking appellants from exiting. Appellant Whitney testified that the previous fall, he went to do something at the property and his access was blocked by a tractor. When asked at trial if he had done so, appellant Darrell Helms testified that he never blocked appellant Ridgeway from coming in and out of the property. He admitted placing a 1995 Chevy pickup truck in the driveway blocking appellants,  but testified that he did so because "he was on the property up there and he wasn't suppose (sic) to be." Trial Transcript at 98. He testified that appellant Ridgeway was not working on the well at the time and that he had told him "before he went through not to go up there…" Trial Transcript at 98.  Appellant Darrell Helms further testified that after the first day of trial, his granddaughter had parked her Honda in the driveway, but that the Honda did not block access.

{¶38}   Based on the foregoing, we find that the trial court's finding that appellees did not prevent appellants from producing the well was not against the manifest weight of the evidence. The trial court, as trier of fact, was in the best position to access credibility and found appellees to be credible.

{¶39}   Appellants also take issue with the trial court's finding that appellants could have used a generator to produce the Crider well. Appellant Whitney did not deny

that it would have been possible to put a gas powered pump on the well, but testified that it would be unreasonable to do so because electricity was available and that it would have been very expensive to do so.  Appellant Whitney also testified that in 2012, he reported to the ODNR that 45 barrels were produced from the well. However, he testified that the oil probably was not brought out of the ground in 2012 but was previously produced and that no royalties were paid.  He testified that they used their temporary engine sometime between April 4, 2012 and July of 2012.  Later, appellant Whitney testified that some of the 45 barrels may have been brought out in 2012 "because I think we did run it some with that gasoline engine." Trial transcript at 26. When asked whether it was possible that a gas engine could produce it without electricity, he testified that " I would say gasoline without this uh,  this is a rather small engine and I don't know how well it would work on a continuing basis anyhow." Trial Transcript at 26. Appellant Whitney testifies that it was not practical to manually start up a gas engine.

{¶40}   Based on the foregoing, we find that there was competent, credible evidence supporting the trial court's finding that a gas generator could have been used to produce the Crider well.

{¶41}   Appellants also argue that the trial court's finding that a new electric pole was set sometime in 2011 or 2012 and that electric power could have been run to the well at that time was against the manifest weight of the evidence. Appellee Dortha Helm testified that a new electric pole which is visible in several of photos that were admitted as exhibits   has "been there for a long time." Trial Transcript at 156.  On cross-examination, she was unable to say when the photos were taken, but testified that the

photos were taken "maybe two or three years ago or more." Trial Transcript at 159. Her husband testified that the new pole could have been erected three or four years ago. When questioned about the new pole, appellant Whitney testified that he did not know how the pole came about and that he first saw the new pole after the case sub judice was filed in November of 2012. He indicated that he would go onto the property at least twice a year. Appellant Ridgeway testified that he visited the well every other month and that he did not know when the new pole was erected. He also indicated that he did not notice the new pole until after the lawsuit was filed.

{¶42} Based on the testimony that the photos taken by appellee Dortha Helms showing the new pole were taken two or three years before the trial, we find that the trial court's finding was not against the manifest weight of the evidence. Moreover, assuming, arguendo, that appellants are correct that the trial court's finding about the new pole as against the manifest weight of the evidence, we note that the trial court alternatively stated that, "[i]n addition,…even with the electrical supply terminated…a generator could have been supplied by the Defendants to produce this well." Any error with respect to the finding about the placement of the new pole was, therefore, harmless.

{¶43} Appellants' first, second and third assignments of error are, therefore, overruled.

IV

{¶44} Appellants, in their fourth assignment of error, argue that the trial court did not have jurisdiction to order that the well must be plugged within four months.

{¶45} We review the issue of subject-matter jurisdiction de novo. *State ex rel. Post v. Speck,* 185 Ohio App.3d 828, 2010–Ohio–105, 925 N.E.2d 1042, ¶ 10 (3d Dist.).

{¶46} R.C. 1509.02 states, in relevant part, as follows: "There is hereby created in the department of natural resources the division of oil and gas resources management, which shall be administered by the chief of the division of oil and gas resources management. The division has sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations within the state, …" As noted by the court in *State, ex rel. Morrison v. Beck Energy Corp.,* 9th Dist. Summit No. 2593, 2013-Ohio- 356," R.C. Chapter 1509 thus provides a comprehensive regulatory scheme for oil and gas wells operations in the state." Id at paragraph 17.

{¶47} R.C. 1509.062, which is cited by the trial court, states, in relevant part, as follows: "(A)(1) The owner of a well that has not been completed, a well that has not produced within one year after completion, an existing well that is not a horizontal well and that has no reported production for two consecutive reporting periods as reported in accordance with section 1509.11 of the Revised Code, or an existing horizontal well that has no reported production for eight consecutive reporting periods as reported in accordance with section 1509.11 of the Revised Code shall plug the well in accordance with section 1509.12 of the Revised Code, obtain temporary inactive well status for the well in accordance with this section, or perform another activity regarding the well that is approved by the chief of the division of oil and gas resources management." (Emphasis added). In turn, R.C. 1509.12 provides, in relevant part, as follows: "(B) When the chief finds that a well should be plugged, the chief shall notify the owner to that effect by

order in writing and shall specify in the order a reasonable time within which to comply. No owner shall fail or refuse to plug a well within the time specified in the order. Each day on which such a well remains unplugged thereafter constitutes a separate offense." (Emphasis added).

{¶48} Moreover, R.C. 1509.13(A) states that a person plugging and abandoning a well must have a permit to do so issued by the chief.

{¶49} When the meaning of the statute is "clear and unambiguous," the statute is to be applied "as written." *Boley v. Goodyear Tire & Rubber Co.,* 125 Ohio St.3d 510, 2010–Ohio–2550, 929 N.E.2d 448, ¶ 20. As noted by appellants, the above statutes clearly and unambiguously "position the Chief as the sole initial decider of all issues related the plugging of Ohio wells." We find, therefore, that the trial court did not have jurisdiction to order the well plugged.

{¶50} Based on the foregoing, appellant's fourth assignment of error is sustained.

V

{¶51} Appellants, in their fifth assignment of error, argue that the trial court's finding that the Crider well has an inactive status pursuant to R.C. 1509.062(A)(1) was contrary to law because the Revised Code does not give the trial court authority to declare a well to have an inactive status.

{¶52} Appellees, in their brief, concede that if the trial court lacked jurisdiction to order the well plugged, it lacked jurisdiction to make a determination of whether or not the well is in an inactive status. Having found that the trial court lacked jurisdiction to order the well plugged, appellants' fifth assignment of error is sustained.

{¶53}   Accordingly, the judgment of the Holmes County Court of Common Pleas is affirmed in part and reversed in part.  Those parts of the trial court's November 6, 2012 Decision and Judgment Entry ordering appellants to plug the well within four months and finding the well to be inactive are hereby VACATED.

By: Baldwin, J.

Farmer, P.J. and

Wise, J. concur.